**BUCKHORN, INC., Plaintiff,**

v.

**ROPAK CORPORATION, et al., Defendants.**

No. C-2-86-1489.

United States District Court, S.D. Ohio, E.D.

Feb. 11, 1987.

**212**

Russell A. Kelm, Daniel R. Swetnam, Schwartz, Kelm, Warren & Rubenstein, Columbus, Ohio, for plaintiff.

David Cupps, James H. Gross, Gerald P. Ferguson, John C. Vorys, Vorys, Sater, Seymour & Pease, Algenon L. Marbley, Columbus, Ohio, William M. Curtis, Curtis & Vaccaro, Newport Beach, Cal., Henry Lesser, Dean J. Kitchens, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendants.

## MEMORANDUM OPINION

KINNEARY, District Judge.

Defendants Ropak Corporation and Ropak Holdings Corporation come before the Court seeking a preliminary injunction of certain actions taken by plaintiff Buckhorn, Inc. ("Buckhorn") and its board of directors in response to Ropak's tender offer for any and all shares of Buckhorn stock. More specifically, the defendants seek to enjoin various measures adopted by the directors including: 1) amendments to the chief executive officer's employment agreement; 2) severance and stock option agreements with six key managers of Buckhorn; 3) an employee stock ownership program ("ESOP"); and 4) a Stockholder Protection Rights Plan ("poison pill").

This matter is currently before the Court following an evidentiary hearing on defendants' motion. Based upon the pleadings, evidence produced at the hearing, memoranda, and proposed findings and conclusions submitted by counsel, the Court in this Memorandum Opinion sets forth its findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

## FINDINGS OF FACTS

*Buckhorn, Inc.*

1. Buckhorn is a Delaware corporation, the executive office of which is located in Milford, Ohio. The chief executive officer of Buckhorn is Richard Johnston.

2. Buckhorn is a publicly held company with two classes of stock: common and Series A preferred. Both class of stock are traded on the American Stock Exchange. As of November 18, 1986, there were 1,624,727 outstanding shares of common stock and 1,524,185 outstanding shares of Series A preferred stock. Buckhorn has approximately 8,000 common and 7,000 preferred stockholders. Exhibit 112.

3. Buckhorn currently has three operating units. The largest unit, accounting for 68% of Buckhorn's sales in 1985, is the Material Handling Group. The Material Handling Group manufactures and markets plastic reusable containers under the brand name "NesTier." The NesTier division is considered to be Buckhorn's "crown jewel." Exhibit 131. The other principal unit is the Rubber Products Group, accounting for 25% of Buckhorn's sales in 1985. The Rubber Products Group manufacturers and

markets industrial rubber products out of its facility in Hannibal, Missouri. The third unit is a small sales facility located in the United Kingdom.

4. Buckhorn currently has seven directors, six of whom are outside directors. The six outside directors are John B. Joyce ("Joyce"), a stockbroker at R.W. Baird & Co.; John K. Pfahl ("Pfahl"), a professional director who currently serves on the board of nine publicly held companies; Stanley Schwartz, Jr. ("Schwartz"), the managing partner of a forty-five lawyer corporate and securities law firm in Columbus, Ohio; Frank Krasovec ("Krasovec"), an investment banker; Ronald Dickerson ("Dickerson"), the chairman of GEM Savings; and Robert Crane ("Crane"), the president of Crane Plastics. Johnston Testimony. Richard P. Johnston ("Johnston"), Buckhorn's chairman and chief executive officer, is the only director who is employed by Buckhorn. All the directors except Crane are named as counterclaim defendants in this action.

*Ropak, Inc.*

5. Defendant Ropak Corporation is a California corporation with its headquarters in Fullerton, California. Defendant Ropak Holdings Corp. is a wholly-owned subsidiary of Ropak Corporation formed solely to act in connection with the proposed acquisition of Buckhorn. Ropak Corporation and Ropak Holdings Corp. will be referred to throughout this Opinion as "Ropak." The Chairman and Chief Executive Officer of Ropak is William H. Roper ("Roper"). Roper Testimony.

6. Ropak Corporation is a publicly held company whose securities are quoted on the NASDAQ system. *Id.*

7. Ropak is engaged in the plastics business, but is not a competitor of Buckhorn's in the plastic reusable container business, with the exception of a small operation known as Can-Am Containers, Ltd. Ropak's products are primarily "one-way" containers. *Id.*

8. Nagelvoort & Company, Inc. is an investment banking firm founded by Terry Nagelvoort in 1985. Terry Nagelvoort is also a director of Ropak. Nagelvoort Testimony.

*Buckhorn's History*

9. Buckhorn was formed in the late 1970's with the acquisition of a trucking and distribution company in Columbus, Ohio. In 1980, Buckhorn acquired the material handling division of Midland-Ross Corporation. In 1981, Buckhorn acquired New Idria, Inc., a publicly held company based in California with several different lines of business. At that time, Buckhorn's corporate headquarters were located in Columbus, Ohio. Johnston Testimony.

10. Commencing in 1983, Buckhorn began to streamline its operations by disposing of all its unprofitable divisions. By the end of 1986, this streamlining was nearly complete and left Buckhorn with the Material Handling Group, the Rubber Products Group and the United Kingdom operation. *Id.*

11. During the time period between January 1, 1983 and December 31, 1985, Buckhorn had projected profitable years. However, in both 1983 and 1984, Buckhorn experienced significant losses. Its projected and actual net income (losses) for these years were as follows:

| Year Ended December 31 | Projected Net Income | Actual Income (Loss) |
|---|---|---|
| 1985 | $3,436,000 | $2,143,000 |
| 1984 | $2,003,000 | ($2,975,000) |
| 1983 | $2,080,000 | ($3,757,000) |

McLaughlin Testimony. During this same time period, Buckhorn's total assets declined from $53 million in 1982 to $38.2 million in 1985. From January 1, 1982, to December 31, 1985, Buckhorn had a cumulative loss of $3.93 per share, principally as a result of significant losses in 1983 and 1984. Exhibit 131.

12. In the spring of 1986, Buckhorn's board of directors decided to concentrate on becoming an operating entity instead of simply a holding company. Since the original connection to Columbus had been discontinued, the board of directors decided to consolidate management operations in Milford, Ohio where the Material Handling Group's offices were already located. Consequently, the corporate offices were trans-

ferred from Columbus to Milford and management personnel were transferred from Hannibal, Missouri to Milford. Johnston Testimony.

13. As a part of this consolidation and streamlining, Buckhorn began moving people to Milford and reducing staff. This occurred in two phases in 1986. The first phase included the office move and reduction of 24 employees. The second phase involved the elimination of another twenty employees. Buckhorn estimated these measures would save nearly $3,000,000 per year in future costs. Johnston and McLaughlin Testimony. In addition, Buckhorn negotiated a re-financing of outstanding Industrial Revenue Bonds in order to take advantage of lower interest rates. Buckhorn estimates the cost of streamlining and re-financing was approximately $3,000,000. These costs were all incurred in 1986. *Id.*

14. As a consequence of these non-recurring costs as well as some price competition, Buckhorn was not able to realize its projected net income for 1986 of $3,346,000. Johnston & Joyce testimony. On September 25, 1986, Johnston announced that Buckhorn experienced a third quarter loss of $800,000. Johnston Testimony; Exhibit 129. Nonetheless, the company still projected a profitable fiscal year. Joyce Testimony. Despite this projection, market prices of its securities declined. Exhibit 42. By the time of its November 19, 1986 board meeting, it was clear that the fiscal year would result in a loss of approximately $1,200,000. *Id.* However, by the end of the year, Buckhorn estimated its net loss at $2,250,000 or approximately $1.49 loss per share based upon the total shares outstanding on November 21, 1986. Exhibit 127.

*History of Offer: September 25 to November 19, 1986*

15. In late September, Terry L. Nagelvoort ("Nagelvoort"), a director of Ropak Corporation, and the managing director of Nagelvoort & Company, Inc., financial advisor to Ropak, had a series of telephone conversations with Johnston regarding a possible business combination. Nagelvoort Dep. at 41–42; Nagelvoort Testimony.

The parties agreed to meet on October 28 to further explore the possibilities of such a combination. Johnston Testimony.

16. Between September 5 and October 18, without Buckhorn's knowledge, Ropak purchased an aggregate of 88,000 shares of Buckhorn common and preferred stock in open market purchases. Nagelvoort Testimony; Exhibit 16.

17. For two days, Johnston, Nagelvoort, and Roper met at Johnston's vacation home on Sanibel Island, Florida. Nagelvoort Testimony. During the discussions on October 28, Johnston raised the possibility of a transaction in which NesTier would be sold to Ropak in exchange for "a package of common and voting preferred stock" of Ropak. Johnston Dep. pp. 66–67. In addition, Johnston indicated that he would require a ten-year employment contract as part of any business combination. Nagelvoort Dep. at 53; Exhibit 54–3.

18. At a breakfast meeting on the next day, Johnston met with Roper and Nagelvoort, presented them with two memoranda, and informed them that a business combination would not be feasible at that particular time. Nagelvoort Testimony. The first memorandum stated that a combination would have a "devasting impact" upon Buckhorn at that particular time because of the recent consolidation and streamlining which had occurred. Joint Exhibit 54 at 1–2. Johnston recommended, instead, that they should have "on-going" contact with each other until the timing was better. *Id.* at 1–2; Johnston Testimony.

19. However, Johnston gave Nagelvoort and Roper a second memorandum in which he outlined a possible combination. This included an exchange of Ropak stock for Buckhorn's NesTier division, placement of certain Buckhorn directors on a new, ten member board of the combined company, and ten year employment contracts for Johnston and Roper as well as joint management responsibilities. Nagelvoort and Johnston Testimony; Exhibit 54 at 3.

20. Within 24 hours after the departure of Roper and Nagelvoort, Johnston contacted Schwartz to inform him of his discus-

sions with Roper and Nagelvoort. Johnston Dep. at 87–88.

21. In early November, Johnston visited the California plant of Xytec Plastics, Inc. ("Xytec") and Xytec representatives visited Cincinnati for the purpose of discussing a possible merger of the two companies. Johnston was optimistic about prospects for a Xytec merger. Johnston Testimony.

22. Shortly thereafter, Johnston received a letter from Roper thanking him for his hospitality and reiterating the basis for a possible Buckhorn-Ropak combination. Exhibit 112. On November 14, 1986, Johnston telephoned Roper and Nagelvoort and informed them that Buckhorn and, more specifically, its NesTier division, was "not for sale" and that further discussions with Ropak were a "waste of time." Johnston Testimony; Exhibit 55.

23. Johnston did not, however, report to the directors his unilateral termination of the negotiations with Ropak. Instead, on November 17, Johnston sent the directors a summary of three potential Buckhorn transactions. These included Xytec, Ropak and Lewisystems Inc./Menasha Corp. ("Menasha"). Johnston Testimony; Exhibit 177.

24. After Johnston terminated negotiations, Ropak decided to proceed with a tender offer for Buckhorn's stock. On Monday, November 18, Nagelvoort called Johnston and informed him that Ropak planned to commence a cash tender offer for 55% to 81% of Buckhorn's stock at a price of $4.00 per common share and $5.75 per Series A preferred share. At the time, these shares were selling in the market for $2.875 and $5.125, respectively. Nagelvoort Testimony; Exhibit 112.

25. Prior to the announcement, Nagelvoort had conducted an analysis to evaluate the size of premium which Ropak should pay to Buckhorn. Nagelvoort evaluated the premiums over market paid in other tender offers on the basis of the following:

a. Asset size of the company;

b. Method of payment for the shares;

c. Existence of controlling and minority interests;

d. Market price five days before the announcement of the offer;

e. Price-earnings ratio five days before the announcement of the offer;

f. Percentage paid over market; and

g. Percentage paid over market for companies within the same standard industrial classification code number.

Nagelvoort Testimony; Exhibit 128. This analysis revealed that for companies with assets similar to Buckhorn, premiums over market prices in 1985 equalled approximately 22.8% and, for tender offers at $10 or less, premiums over market prices in 1985 equalled approximately 27.4%. Nagelvoort Testimony; Exhibit 128. In the present case, Ropak's tender offer represented premiums of 39% and 12% over the November 17 market prices of Buckhorn's common and preferred stock, respectively. Viewed in aggregate, Ropak's offer represented a premium of 22.25% over the market valuation of Buckhorn. Nagelvoort Testimony.

26. Subsequently, on November 24, Ropak issued its "Offer to Purchase For Cash All Shares of Common Stock and All Shares of Series A Convertible Preferred Stock of Buckhorn" (the "OPT"). The OTP changed the November 18 announcement by making a cash offer for all of the outstanding stock of Buckhorn and by providing for an increase in the per share prices for the common and preferred stock to $4.25 and $5.875, respectively, in the event the Buckhorn directors negotiated a friendly transaction with Ropak. Exhibit 11. Furthermore, Ropak's offer was conditioned upon receiving tenders of at least 55% of the combined voting power of Buckhorn stock and obtaining sufficient financing to enable it to purchase all shares validly tendered and not withdrawn by the expiration date. *Id.* The November 18 announcement, as amended by the OTP, is hereinafter referred to as the "Ropak offer." The Ropak offer was initially scheduled to expire on December 22, 1986. *Id.*

*Buckhorn Director's Meeting on November 19–20, 1986*

27. Buckhorn had a regularly scheduled compensation committee meeting scheduled

for November 19 and a regularly scheduled board meeting scheduled for November 20. While the original purpose of the directors' meeting was to consider the 1987 budget, the board decided to convene early beginning on November 19 and consider Ropak's offer. Joyce and Johnston Testimony.

28. In advance of the meeting, the directors received several documents. These included a letter dated November 6, 1986 from Schwartz, chairman of the compensation committee, concerning proposed amendments to Johnston's Employment Agreement, Exhibit 95; a memorandum dated November 14 concerning the proposed 1987 budget, Exhibit 61; and a three-page memo dated November 17 which summarized Johnston's discussions with Ropak, Xytec and Menasha. Exhibit 177.

29. Upon convening on November 19, the directors first listened to a presentation by director Schwartz concerning the defensive procedures and alternatives available to Buckhorn. Pfahl Deposition of 12/24/86 at 66 (hereinafter referred to as "Dep. I"); Exhibit 3.

30. Without discussing these options, the directors next considered the various amendments to Johnston's employment contract. Johnston left the meeting at this point. Pfahl Dep. I at 69.

31. The directors had decided by late summer 1986 to take up the question of Johnston's employment contract because of a variety of events which were impacting Johnston's compensation. Johnston had entered a ten-year employment contract with Buckhorn in May 1982. Thereafter, in November 1982, Johnston borrowed the sum of $750,000, interest free, until November 1987 to purchase 230,566 shares of common stock held by an entity known as the Aegis Group. Joyce and Johnston Testimony.

32. However, because of the changes made in the Tax Reform Act of 1986, it was clear that beginning in 1987, the interest not charged on the 1982 loan would be imputed as income to Johnston. *Id.* Consequently, on October 30, 1986, Johnston surrendered to Buckhorn his 230,566 shares of common stock at $3.25, in cancel-

lation of his interest free loan from Buckhorn. On the same day, the Buckhorn Retirement Income Savings and Stock Ownership Plan purchased 131,381 shares of Buckhorn common stock at $3.25 per share. *Id.* and Exhibit 117.

33. Furthermore, on September 30, 1985, Buckhorn's board of directors terminated an existing defined benefit pension plan for its salaried employees. Because of his age, Johnston was more adversely impacted by the termination of the pension plan than other salaried employees.

34. Because of these events, the directors began discussing possible amendments to Johnston's employment contract. These changes focused primarily upon Johnston's stock holdings and pension benefits. Pfahl Dep. I at 69-70. However, on November 4, 1986, director Schwartz circulated a memorandum which he had drafted, wherein he proposed a variety of amendments. These amendments included extending Johnston's term of employment to December 31, 1995; termination only for gross negligence; and the right to demand a lump sum payment representing the present value of the future salary owed him under the terms of the agreement in the event of an unapproved change in control. In addition, Schwartz proposed that Johnston receive a pension supplement which provided that for each year of service, Johnston would receive two years of benefits. This amendment also allowed Johnston to demand accelerated funding of his pension up to the amount allowed by section 280G of the Internal Revenue Code upon a change of control. Finally, Schwartz proposed that Johnston receive stock options of 500,000 shares of common stock. None of the members of the compensation committee had seen a copy of this memorandum prior to its circulation. Moreover, the change of control provisions had not been discussed, nor did they appear in drafts prior to November 4, but, rather, were a response to Ropak's offer. Pfahl Dep. I at 70.

35. After consideration, the directors amended Schwartz's proposal by removing the termination only for gross negligence

provision, reduced Johnston's stock option to 235,000 shares at $3.875 per share, and, at the December 6, 1986 directors' meeting, added a three-year non-competition clause. The Board understood that the cost of Johnston's severance pay in the event of a change in control would be nearly $460,000 and that the cost to Buckhorn of Johnston's pension supplement through 1995 would be approximately $35,000 per year. Joyce Testimony; Exhibit 95.

36. The Board next considered granting stock options and severance payments to six-key management employees. This proposal had not been considered at any prior point at time but had arisen only since the announcement of Ropak's offer. Pfahl Dep. I, p. 72–73. The proposal was brought before the directors because some of Buckhorn's managers were concerned about job security in light of the Ropak tender offer. Johnston and Joyce Testimony. The proposal allowed these executives to purchase an aggregate of 100,000 common shares which could be exercised upon a change in control not approved by the directors. In addition, the severance plan provided that upon a change in control not approved by the board, if the managers were either fired or quit after a change in work responsibilities, they could demand accelerated payment up to the maximum authorized by section 280G of the Internal Revenue Code. The agreements could not be exercised at-will and were in effect only for the first twelve months after a change of control. Exhibits 158–163.

37. The board approved both the stock options and severance pay plans in order to provide greater security to these six employees since it was particularly important to retain these individuals, five of whom had just relocated to Cincinnati, in order to assist Buckhorn in making its transition to an operating company. Joyce Dep. at 94–96; Joyce and Johnston Testimony. The directors understood that, if triggered, the maximum cost of these provisions would be approximately $750,000. Joyce Testimony.

38. In order to facilitate the issuance of 335,000 new stock options, the directors unanimously approved the authorization of a new 1986 Stock Option Plan which made available 200,000 new stock options. Joyce Dep. at 100; Exhibit 3. Each of these options could be immediately exercised upon a change of control not approved by the directors. Id.

39. The directors also unanimously authorized changes to the existing stock option plans and restricted stock option plans to provide that all options under said plans would vest immediately upon any change in control not approved by the board. Joyce Dep. at 101; Exhibit 3.

40. At no occasion prior to the meeting had the directors considered or proposed creating a new stock option plan or amending the current plans to allow them to vest upon a change of control. Joyce Dep. at 100–101.

41. As a result of granting these additional options, there was a rather significant dilution of Buckhorn shareholder's equity. Prior to the directors' actions, there were 1,625,000 common shares outstanding. The directors' actions made an additional 505,000 common shares issuable on exercise of options. (100,000 to six executives, 205,500 outstanding under amended plans and 200,000 under the new plan.) Joyce Testimony. After converting preferred shares to common shares, these options represented approximately 13% of Buckhorn's stock. All of these options could be exercised at a price less than the Ropak offer. Id.

42. Concern was raised at the meeting by Pfahl as well as the other directors about the potential dilution of shareholders' equity. Joyce Dep. at 105–107. The directors were aware of this consideration and determined that the dilution could not be any more than 20% without being unfair to the shareholders. There is no indication as to how the directors arrived at this figure. Id. at 107–108.

43. All of the above actions were taken notwithstanding the fact that the directors had not, as yet, taken a formal position on the Ropak offer. Indeed, they deferred this decision until the next board meeting. See infra ¶¶ 60–76. However, it is clear that the board members were at least dis-

appointed with the price offered and were upset with the timing and circumstances of the offer. Pfahl Dep. I at 91.

44. Although the directors maintain that the above steps were not taken to stop the Ropak offer, it is at least conceded that the Ropak offer triggered the above actions. Joyce Testimony.

45. Although the directors maintain that the above steps were not taken to stop the Ropak offer, the Court cannot credit this testimony. All of the above actions taken by the directors, with the exception of some of Johnston's employment contract amendments, were considered for the first time by the directors after the Ropak tender offer was announced and only after director Schwartz had given a presentation of possible defensive measures which the board could adopt to thwart the Ropak offer.

46. In taking these steps, the Court finds that the directors were motivated primarily by two objectives: 1) to stop the tender offer, although they had not yet received an evaluation of its adequacy; and 2) to provide some security and substantial compensation to top management at a critical point in the company's transition. These actions were taken notwithstanding the potentially large cost to shareholders, although it is clear that these costs were duly considered by the directors.

47. After approving the above measures, the directors heard a presentation by representatives from Blunt, Ellis & Loewi ("BEL"), a regional investment banking firm who had done work for Buckhorn in the past, on their proposal to conduct an adequacy evaluation of the Ropak offer. The meeting was then adjourned until the next morning. Joyce Testimony; Exhibit 3.

48. On November 20, the directors were told that Buckhorn would experience a fourth quarter loss of approximately $300,-000, notwithstanding its public announcement on September 25 projecting a profit for the fourth quarter. McLaughlin Testimony.

49. The directors also heard a presentation by Carl McLaughlin ("McLaughlin"), Buckhorn's Director of Planning, of the 1987 budget projections. McLaughlin projected a $2.8 million net profit for 1987 largely resulting from decreased operation costs, reduced price competition and increased orders. Although discussion of the 1987 budget projection initially was to be one of the directors' major agenda items, McLaughlin's presentation only lasted thirty minutes. McLaughlin Testimony.

50. The directors next authorized the current litigation. They also authorized Johnston to explore alternatives to the Ropak offer including: a) a public or private sale of Buckhorn securities; b) a self-tender; c) a sale of a significant portion of Buckhorn; d) a spin-off of certain assets; e) a business combination or joint venture between Buckhorn and one or more companies; and f) acquisition by Buckhorn of all or part of the business of any other company. Joyce Testimony, Exhibit 117. Although they authorized Johnston to explore a wide variety of options, the directors did not authorize Johnston to negotiate further with Ropak. Pfahl Dep. I at 153; Pfahl Trial Deposition ("Dep. II") at 39; Johnston Testimony.

51. Finally, the directors decided not to take a position on the Ropak offer, but authorized BEL to conduct an evaluation of the adequacy of the Ropak offer. Joyce and Johnston Testimony; Exhibit 3.

*November 21 to December 6, 1986*

52. As instructed by the directors, Johnston immediately began looking "to acquire something or divest something." Johnston Dep. at 136. Anything "conceivably available" was an alternative for Buckhorn, even if Buckhorn had to "grow more legs ... or amputate an arm." Johnston Dep. at 171; Johnston Testimony. Between November 20 and the directors' December 6 meeting, Johnston pursued negotiations with Xytec, Menasha and several other companies. Johnston Testimony.

53. In a memorandum dated November 24 to Spencer Hoops, Chairman of Xytec, Johnston proposed the acquisition of 100% of Xytec for 1,000,000 Buckhorn common shares. Johnston Testimony; Exhibit 98.

Under the Johnston proposal, Xytec would be required to warrant that Xytec had a net worth of $750,000 and off-balance sheet assets of $2 million. A portion of the Buckhorn stock would be escrowed. In the event that Xytec's net worth was determined after closing to be less than $750,000 or the off-book assets were determined to be worth less than $2 million, the purchase price of Xytec would be reduced and the number of Buckhorn shares to be released from escrow would be correspondingly reduced. Exhibit 98. Although Johnston testified that he believed that Xytec would be worth $4.15 per Buckhorn share, the Johnston proposal valued Buckhorn common stock at $2.75 per share. In addition, Johnston's Xytec proposal, if approved, would have caused a change in control of Buckhorn since Xytec would have been accorded a plurality of the directorships on the Buckhorn board. Johnston Testimony; Exhibit 98.

54. Between November 20 and December 6, Johnston intensively negotiated to sell NesTier, the "crown jewel," to Menasha, the largest manufacturer of containers similar to Buckhorn's. Menasha was a company with which Johnston had been holding discussions for several years. Those discussions had progressed to and beyond the point at which Menasha and Buckhorn exchanged internal financial information. Johnston Testimony.

55. Since the Ropak offer, Johnston negotiated with a total of eleven different parties regarding possible private placements, business combinations or sales of Buckhorn or NesTier. Johnston Testimony.

56. During the same time period, BEL performed its "fairness" evaluation of Ropak's offer. Although the directors approved retention of BEL, neither the entire board nor a committee of independent directors supervised the rendition of services by BEL. On the contrary, all of the contact with BEL was handled either by Johnston, by employees of Buckhorn who reported to Johnston, or by lawyers at the Schwartz firm. Beginning on November 20, David Downen ("Downen") and John Hill ("Hill") of BEL gathered information about Buckhorn from Buckhorn's management and information about Ropak from public sources in anticipation of a presentation to the directors on December 6. Johnston Dep. at 165 and Downen Dep. at 48. BEL knew that Buckhorn had a loss in the third quarter and was likely to have a loss in the fourth quarter. Hill Dep. at 20. BEL did not make inquiries of Buckhorn's suppliers, lenders or customers about Buckhorn and its operations and limited its inquiry to public data about Buckhorn, internally generated Buckhorn data and past knowledge accumulated during its participation in a 1985 Buckhorn debt offering. Downen Dep. at 49.

57. On December 1, 1986, Downen met with Johnston at which time Johnston discussed the liquidation worth of Buckhorn. At that point, Johnston proceeded through a rough break-up analysis in which he priced various Buckhorn assets based upon what he thought he could get for them. Downen Dep. at 95–99. Based on this rough break-up analysis, Johnston told Downen that Ropak's offer was inadequate. *Id.* at 96.

58. On December 5, representatives from Xytec met with Johnston, Downen and a member of the Schwartz law firm to discuss a possible combination between Xytec and Buckhorn. *Id.* at 106. By the end of the meeting, it was clear that the Xytec deal was dead because Johnston and Downen believed that Xytec had overvalued its assets. *Id.* at 115.

59. At 8:00 a.m. on the morning of December 6, Menasha offered $35 million ($27.5 million in cash, $7.5 million in assumption of Buckhorn liabilities) for NesTier. Johnston Testimony.

*Directors' Meeting on December 6, 1986*

60. The directors first formally adopted the various employee contract and stock option changes discussed and approved at the November 19–20 directors' meeting. Exhibit 7.

61. The directors next considered the adoption of an employee stock ownership plan ("ESOP"). Although there had been some informal discussions throughout the

year about doing something in the pension area, the record indicates that the directors considered creation of an ESOP for the first time at the December 6 meeting. Joyce Dep. at 160; Joyce Testimony. After a brief discussion, the directors conceptually approved the creation of an ESOP and instructed counsel to prepare one. Pfahl Dep. I at 135–138; Pfahl Dep. II at 75.

62. At this point of the meeting, the floor was given to Messrs. Downen and Hill to present the results of their "fairness evaluation" of Ropak's offer. Exhibit 7.

63. Prior to the directors' meeting of December 6, BEL had performed a historical evaluation analysis of Buckhorn's securities. This analysis revealed that between 1985 and November 1986, Buckhorn's stock ranged between $2.50 and $5.00 for common shares and $3.78 and $6.875 for the preferred shares. Exhibit 33. Moreover, the range of the value of Buckhorn as valued by the market prices of its stock in the last 52 weeks was from $12.4 million to $19 million. *Id.* Finally, application of this methodology indicated that the highest value which the stockmarket had ever placed on Buckhorn was $19.7 million. *Id.* at 3. In contrast, the value of Ropak's offer of $4.25 and $5.875 for common and preferred stock, respectively, was approximately $17.8 million. Downen Dep. p. 56. BEL did not present this analysis to the directors.

64. Downen and Hill began their presentation by Ropak's offer. Downen explained to the directors that Ropak's offer was not a two-tier tender offer but was an all cash offer. Downen Dep. p. 125. However, Downen expressed some skepticism about the likelihood of Ropak obtaining full financing to purchase all outstanding shares since at the time, Ropak had no cash on hand. He also indicated that some Buckhorn shareholders might be stuck on the "back-end" of the offer or might not accept the tender offer and end up as minority shareholders. Finally, he expressed concern that, because of Ropak's level of debt, the Ropak securities offered to these "back-end" or minority shareholders might

be less valuable or more risky than the Buckhorn securities for which they would be exchanged. *Id.* at 129–130.

65. Downen and Hill then proceeded to discuss the three analyses they did to evaluate the "fairness" of Ropak's offer. The first of these involved a comparison of Buckhorn with similar public companies. Exhibit 42; Downen Dep. at 141. BEL looked at a variety of multiples based on the adjusted market value of these public companies divided by such factors as revenues, operating earnings, net earnings, earnings before interest and taxes and stockholders equity. Exhibit 42. These multiples were then applied to Buckhorn and resulted in a valuation for Buckhorn of between $11.2 million and $26.4 million, with a median valuation of $18.8 million. *Id.*

66. Also, as a part of this analysis, they took the Buckhorn's earning per share range and applied various price/earnings multiples to determine a valuation. Using price/earnings multiples which were representative of the comparable public companies, Downen reported a valuation range for Buckhorn of between $16 million and $21.5 million. Downen Dep. at 152–153. In performing these calculations, BEL used earnings per share figures for Buckhorn from the 1985 year and the 1987 projections, the only two years showing a profit. At no point did any director question why only the earnings per share from profitable years were used or why the years in which Buckhorn showed a loss were excluded. Nor did any director question the propriety of using price/earnings multiples that were reflective of profitable companies when Buckhorn had a history of loss earnings. BEL did not give any bottomline conclusion based on its presentation of the public company comparables. Downen Dep. at 149.

67. Because the above comparison only reflected the minority interest transactions and not control transactions, Downen and Hill then presented an analysis of a control transaction involving a similar company, Pawnee Industries, Inc. ("Pawnee"). Again, BEL looked at the relationship between the purchase price and such varia-

bles as earnings per share, premium over pre-offering price, and operating earnings. Exhibit 42. Based upon the Pawnee pre-purchase variables, BEL determined under this that Buckhorn's common and preferred stock should be valued at $3.65 and $6.51 per share, respectively. *Id.* However, BEL's analysis based upon earnings per share and operating earnings indicated higher values for Buckhorn stock. Again, however, these figures were based only upon Buckhorn's optimistic 1987 budget projections and its 1985 calendar year. Thus, this analysis failed to include budget years in which Buckhorn failed to make a profit. In addition, BEL's analysis neglected to take into account the fact that Pawnee had a history of consecutive profitable years while Buckhorn had a history of losses.

68. The directors failed to ask any substantive questions concerning the Pawnee analysis. Downen Dep. at 157. Nor did BEL reach any bottomline from this analysis. *Id.*

69. The final analysis presented by BEL was a discounted cash flow valuation. In performing this analysis, BEL relied upon two projections of future earnings. The low case involved the use of the November 14 budget plan which estimated income before taxes of $2.83 million. For the high case, they used a revised 1987 budget prepared by McLaughlin which estimated projected net income of $4 million. Downen Dep. at 161. At no point did BEL attempt to evaluate the accuracy of either projection even though Buckhorn's poor history of meeting projections caused BEL to question their validity. Hill Dep. at 40. BEL projected future earnings over the next five years based on these two budgets and a variety of other assumptions. Exhibit 42.

70. Using a 12% discount rate, which approximates Buckhorn's cost of capital, BEL estimated a valuation range of between $16 million and $21.7 million for the low budget estimate and $27.8 million to $37.1 million for the high budget estimate. Exhibit 42.

71. The directors asked Downen about some of the assumptions they used in making the five-year projections. Downen Dep. at 161. However, the directors did not question the use of the high or low 1987 budget projections nor make any mention or direct any inquiries about the fact that Ropak's offer fell within the range of values based on the low budget projections. *Id.* at 163. Once again, Downen did not draw any particular conclusions from the cash flow valuation. *Id.* at 163.

72. However, at the conclusion of this last analysis, Downen told the directors that "the weight of the evidence that we gathered and our analysis [is] that [Ropak's] offer [is] inadequate." Downen Dep. at 163. The record does not indicate that BEL explained to the directors the specific facts upon which its opinion was based, nor did the directors ask for such specificity. BEL arrived at its opinion despite the fact that the Ropak's offer fell within the range of valuations determined in three out of the four analyses it performed. *Id.* at 163; *see supra,* ¶¶ 63, 66, 67, 70. The exception was its discounted cash flow valuation. However, even here it was within the valuation range for the low 1987 budget projection. The directors then asked BEL to state what price would be adequate or to quantify a range of adequate values. BEL refused. The directors asked how close Ropak's offer was to being adequate but, again, BEL declined to comment since that matter was outside the scope of its contract. *Id.* at 164.

73. At this point in time, Johnston presented a crude "break-up" analysis to the directors. He indicated to the directors that Menasha had made a $35 million offer for Buckhorn's NesTier division. Downen Dep. at 165–167. He started his analysis with the $35 million offer of Menasha for NesTier, then increased the Menasha offer by $10 million to a hypothetical NesTier sale price of $45 million. Downen Dep. at 165, Joyce Testimony; Exhibit 101. The only basis for doing so was Johnston's belief that he could get $45 million for NesTier. Johnston also assumed that all debts would be paid and that Buckhorn would be able to sell its remaining assets at their

respective book value. Given these assumptions, Johnston's analysis yielded a hypothetical pool of $26.5 million in cash available for distribution to stockholders. Exhibit 101. The Johnston analysis did not, however, include any reserve for the expenses of liquidation, any adjustment for the time value of money during the period required to liquidate Buckhorn, or any tax consequences of the sale of Buckhorn's assets other than NesTier. Joyce Testimony. In addition, the Johnston's analysis stopped at the corporate level. It did not account for the second level of taxation which would occur when the hypothetical pool of cash was distributed to shareholders. *Id.*

74. Johnston also presented a break-up analysis based on the actual $35 million Menasha offer. Such presentation assumed the payment of debts and the sale of remaining assets and showed a pool of cash of $19 million available for distribution to stockholders before any deduction for expenses, corporate taxes or adjustments for the time value of money. Exhibit 101. This analysis, like the previous analysis, ended at the corporate level and did not account for taxation of the distribution to stockholders. If the level of taxation had been included the directors would have seen that Menasha's $35 million offer yielded less cash to the Buckhorn stockholders than the Ropak Offer. Upon completing his analysis, Johnston told the directors that, in his view, BEL should undertake a breakup analysis of Buckhorn. Downen Dep. at 171.

75. At this point in the meeting, the directors took a vote and unanimously rejected Ropak's offer. The directors took this action based on a variety of considerations. These included:

a) BEL's analysis that Ropak's offer was inadequate;

b) Streamlining of Buckhorn and a shift to an operating company, as opposed to a holding company, would reduce costs;

c) An increase in the number of new orders would increase revenues;

d) Based on the above, a perception that Buckhorn's past performance was not indicative of its future potential and that the stock market did not properly value Ropak's stock;

e) Concern that Ropak would not be able to finance the entire purchase of stock, thus turning the offer into a two-tier tender offer wherein nontendering shareholders might get stuck with securities of lesser value; and

f) A dislike or distrust for Ropak because of the manner in which it initiated the tender offer.

76. In addition to rejecting Ropak's offer, the directors also rejected Menasha's offer to purchase NesTier for $35 million, but authorized Johnston to continue discussions with Menasha for the sale of Buckhorn's NesTier division. Johnston Testimony. The directors discussed a Stockholder Protection Rights Plan ("poison pill") and instructed counsel to prepare a Plan for discussion at a special directors meeting scheduled for December 13. In this light, the directors commissioned BEL to render an opinion as to the fair value of Buckhorn's stock in case Buckhorn decided to include a pricing mechanism in the Plan.

*December 7 to December 17, 1986*

77. On December 7, Johnston called Menasha to discuss selling NesTier for $45 million. Menasha's President told him that Menasha had to struggle to reach the $35 million offer. Johnston told him that Buckhorn needed a quick answer. To date, no offer to purchase NesTier for more than $35 million has been received from Menasha or any other party. Johnston Testimony.

78. On December 8, Buckhorn issued a press release announcing that the directors had determined that the Ropak Offer "... is inadequate and not in the best interest of Buckhorn or its stockholders" and strongly recommended that stockholders reject the offer. Exhibit 117. This announcement was followed by a letter of similar tenor sent to all Buckhorn stockholders of record. Exhibit 117.

79. After the December 6 meeting, Johnston asked McLaughlin to prepare a

break-up analysis. In performing his analysis, McLaughlin estimated the worth of NesTier by multiplying the 1987 pre-tax profit of $5.6 million by a factor of 8. This yielded an estimated sales value for NesTier of $44.8 million. Exhibit 59. According to McLaughlin, he was instructed by Johnston to use a multiple of 8 in doing his calculation despite the fact that BEL used a multiple of 6 in doing a similar analysis. McLaughlin Testimony; Hill Dep. at 44; Exhibit 42. McLaughlin's analysis valued Buckhorn at 26.5 million and recommended $6 and $10 prices for common and preferred stock, respectively. This analysis was sent to the directors on December 10.

80. McLaughlin performed a second analysis based on the same set of assumptions as the first. However, because of various refinements in the analysis, he revised his estimate of the value of Buckhorn down from $26.5 million to $22.5 million. This analysis was sent to the directors on December 16.

*Buckhorn Directors' Meeting on December 13, 1986*

81. The directors reviewed a preliminary description of the poison pill prepared by Schwartz. Dickerson Dep. at 111. However, the directors deferred approving the plan until they had an opportunity to review a draft of it.

82. The directors also authorized the funding of the Buckhorn Employee Stock Ownership Plan (the "ESOP"), establishment of which had been approved at the December 6 meeting. Exhibits 122 and 126. The directors authorized a $150,000 cash contribution for the purchase of shares on the open market for the ESOP. *Id.* at 164–165. Exhibit 113, Item 3. Two officers of Buckhorn, Messrs. Martin and Burser, were appointed as the trustees of the ESOP.

83. The avowed purpose of the ESOP was to provide a pension for non-salaried employees. However, its affect was to make a takeover more difficult by placing a substantial block of shares in the hands of friendly employees and officers. Joyce Dep. 160–165.

*Buckhorn Directors' Meeting on December 17, 1986*

84. On December 17, the directors meet for the principal purpose of adopting the Shareholder Rights Protection Plan ("poison pill") prepared by Schwartz, Johnston and Buckhorn management. Exhibit 123.

85. The poison pill provided for a distribution of six rights per common share and ten rights per Series A preferred share of stock owned by a Buckhorn shareholder on the close of business on December 17, 1986 or before the close of business on the date on which the rights could be exercised. In the event that anyone acquires 50% or more, but less than 100%, of the outstanding voting power of Buckhorn, each right entitles stockholders to exchange with Buckhorn their shares of common and preferred stock for subordinated notes or a new series of preferred stock with a value fixed by the Buckhorn directors at $6 per share of common stock and $10 per share of preferred stock. The poison pill is not triggered if the offeror pays at least $6 per common share and $10 per Series A preferred share. In addition, the rights are redeemable at the option of Buckhorn by action of its directors at a price of $0.00167 at any time prior to the date on which any person acquires beneficial ownership of 40% or more of Buckhorn's outstanding stock so long as the redemption is approved by directors who were in office on December 17 or who are defined in the poison pill as "independent." Directors nominated or elected by Ropak would not be deemed independent under the poison pill. Exhibit 167.

86. The $6 and $10 price triggers included in the poison pill were based upon a break-up analysis performed by BEL and McLaughlin.

87. In performing BEL's analysis, Hill began with the assumption that the range in value of Buckhorn was between $22.7 million and $26.5 million. Exhibit 100. The former figure was supposedly based upon BEL's public company comparison. Hill Dep. at 74. However, Hill could not identify the precise method used to arrive at this estimate. *Id.* at 73–74. Given the

range of values for Buckhorn derived from BEL's public company comparison of between $11.2 million and $26.2 a million, with a median valuation of $18.8 million, the Court finds this lower value chosen by BEL to be entirely arbitrary. Exhibit 42

88. The upper limit of BEL's analysis was based solely upon the break-up analysis presented by Johnston at the December 6 directors' meeting. Hill Dep. 74. At that time, Johnston estimated that Buckhorn was worth approximately 26.5 million. The key assumption behind this figure was Johnston's belief that NesTier could be sold for $45 million. BEL did not verify or challenge the assumption despite the fact that it was undocumented and that no one had offered $45 million for NesTier. Nor did BEL question or attempt to verify the validity of any of the other assumptions Johnston made in his break-up analysis. *Id.* at 60–62.

89. Johnston's analysis is also deficient in several other material aspects. After the sale of NesTier, Johnston's analysis showed a pool of cash of $26.5 million available for distribution to shareholders. Exhibit 101. As discussed earlier, however, his analysis did not include any reserve for the expenses of liquidation, any adjustment for the time value of money during the period required to liquidate Buckhorn, or any tax consequences of the sale of Buckhorn's assets other than NesTier. Joyce Testimony. In addition, his analysis ended at the company level. It did not account for the second level of taxation which would occur when the hypothetical pool of cash was distributed to shareholders.

90. The second analysis was conducted by McLaughlin, Exhibit 59. Although it is clear that BEL did not rely upon this analysis, a copy of it was sent to the directors prior to the December 17 meeting. Like Johnston's analysis, McLaughlin's break-up analysis assumed that NesTier was worth $45 million. However, McLaughlin's analysis is also materially deficient. First, it applied a multiple of 8 to estimated pre-tax income to arrive at a cash value for NesTier. This multiplier was chosen arbitrarily

by Johnston and appears to over-inflate the value of NesTier. *See supra* ¶ 79; Hill Dep. at 44. In addition, it was based upon an estimated pre-tax income of $5.6 million. This figure has never been questioned or scrutinized by the directors and, given Buckhorn's past history in developing overly optimistic budgets projects, is of questionable validity.

91. Although BEL initially calculated a range of values for Buckhorn, Downen decided to base the pricing of Buckhorn stock on the upper level figure of $26.5 million. His only reason for doing so was because he believed that the value "should be aggressive because it's going to be a published value ..." Downen Dep. at 191–192, 195. Consequently, the liquidation value which served as the basis for BEL's recommendations was not the result of their own work, but rather was derived solely from the undocumented, unverified and materially deficient analysis performed by Johnston.

92. Having accepted Johnston's bottom-line that $26.5 million would be available to the shareholders, BEL attempted to divide the pool of cash between common and preferred shareholders. This resulted in pricing the common and preferred stock at $6.40 and $8.65, respectively. Exhibit 100. Hill then spoke with Schwartz. Because of Buckhorn's Certificate of Incorporation contains a liquidation preference of $10 for the preferred stock, BEL, on the advice of Schwartz, allocated $10 of the aggregate value to each share of preferred stock and the residual to the common stock. Exhibit 44; Downen Dep. at 192; Johnston Testimony. In addition, BEL increased the aggregate price by $1.2 million and priced Buckhorn at $27.7 million. Exhibit 100; Hill Dep. at 83. This resulted in a price of $6.14 per share of common stock. Exhibit 100.

93. Based upon the above analysis, BEL issued a two-page opinion dated December 15 that, for the purpose of the poison pill, recommended that the fair market values of common stock and preferred stock were $6.00 and $10.00, respectively. Exhibit 44.

94. The record indicates that no director questioned Downen during the telephonic directors' meeting on December 17 about BEL's opinion or the basis for it, nor had any of the directors seen any of BEL's work papers. Pfahl Dep. II at 97. The directors then unanimously approved the adoption of the poison pill.

95. Although not relied upon by BEL or the directors, McLaughlin had prepared and mailed to the directors a revised liquidation analysis of Buckhorn on December 16. This revised analysis still relied upon Johnston's assumption that NesTier could be sold for $45 million. However, this refined, internal "break-up" analysis only projected a net gain of $22.5 million at the company level. Exhibit 99, Pfahl Dep. II at 101. Again, like Johnston's analysis, McLaughlin's revised "break-up" analysis does not take into account the time value of money, the time it takes for liquidation, or the tax consequences of distributing funds to shareholders from a company level. *Id.* at 102.

96. The poison pill in conjunction with the ESOP and stock options significantly increase the cost of the tender offer since the latter two create a "back-end" purchase under the terms of the poison pill. The actions taken by the directors on November 19–20 potentially result in the issuance of 740,500 additional common shares. At the $6 trigger price, these share would have a total cost under the poison pill of $4,443,-000. Assuming an exercise price of $3.875 per share for the 335,000 options granted to Johnston and the six key employees and the 200,000 options authorized by the directors and, further assuming an exercise price of $3.571 for the options outstanding (Exhibit 1), the options would have a net cost to Ropak of $1,636,035 ($4,443,000 less $2,806,965 representing the proceeds to Buckhorn from the exercise of these options). The 36,100 common shares purchased in the ESOP would have a total cost to Ropak of $366,000 (cost of $216,000 under the poison pill plus $150,000 contributed by Buckhorn to fund the ESOP's purchase of such shares).

*December 18, 1986 to January 28, 1987*

97. On December 18, Buckhorn announced the adoption of the poison pill, including the $6 and $10 trigger prices. Exhibit 119. The announcement was carried in the financial press. Nagelvoort Testimony. On or about December 22, Buckhorn sent a letter to its stockholders regarding the poison pill. Johnston Testimony. As of this time, approximately 21% of Buckhorn's shares had been tendered. As a result of the adoption of the poison pill, Ropak extended its offer from December 22 to February 6, 1987. Exhibit 114.

98. On January 7, Buckhorn issued a press release that reported its estimated loss for 1986, and on January 12 Buckhorn began distributing a letter to its stockholders reaffirming the Board's position that the Ropak Offer was inadequate. Exhibit 121.

99. On January 28, Ropak announced that it had obtained financing commitments sufficient to enable it to finance the offer and pay related costs, assuming all shares of Buckhorn stock presently outstanding and issuable upon the exercise of option are validly tendered. Ropak has also conditioned its offer or the redemption of the rights issued under the poison pill or a judicial determination that the poison pill is unenforceable. Exhibit 130.

100. On February 6, 1986, Ropak notified the Securities and Exchange Commission that it was extending its tender offer until Thursday, February 12, 1987.

## DISCUSSION

This matter is before the Court to consider defendants' application for preliminary and permanent injunctive relief pursuant to Rules 42(B) and 65 of the Federal Rules of Civil Procedure. More specifically, Ropak seeks a preliminary injunction of the amendments to Johnston's employment agreement, the severance agreements between Buckhorn and the six key management employees and the amendments to all existing Buckhorn stock options plans which allow the options to be exercised upon a change of control. Ropak seeks a

permanent injunction of Buckhorn's ESOP and poison pill.

In considering whether Ropak is entitled to preliminary injunctive relief, the Court must determine:

(1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits;

(2) whether the movant has shown irreparable injury;

(3) whether the issuance of a preliminary injunction would cause substantial harm to others; and

(4) whether the public interest would be served by issuing a preliminary injunction.

*Mason County Medical Assn. v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977). Furthermore, according to *Fleet Aerospace Corp. v. Holderman,* 637 F.Supp. 742, 749 (S.D. Ohio), *aff'd,* 796 F.2d 135 (6th Cir.1986), Ropak bears the burden of proving each of the foregoing elements before a preliminary injunction can be issued.

With respect to Ropak's request for a permanent injunction, Ropak must prove the following elements:

(1) that it has prevailed on the merits;

(2) that it will suffer continuing irreparable injury unless an injunction is issued; and

(3) that it has no adequate remedy at law.

*Dayton Christian Schools, Inc. v. Ohio Civil Rights Commission,* 766 F.2d 932, 961 (6th Cir.1985), *rev'd on other grounds,* — U.S. —, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986).

In considering the merits of Ropak's motion, the Court first notes that Buckhorn is a Delaware corporation and, accordingly, the conduct of its directors is governed by Delaware law.

Under Delaware law, the directors of a corporation owe unyielding fiduciary duties of care and loyalty to the corporation and its shareholders. *Guth v. Loth,* 23 Del.Ch. 255, 5 A.2d 503 (1939). The fiduciary duty of care requires a director to exercise an informed business judgment and to consider all material information reasonably available before making a business judgment.

[F]ullfillment of the fiduciary function requires more than the mere absence of bad faith or fraud. Representation of the financial interest of others imposes on a director an affirmative duty to protect those interests and to proceed with a critical eye in assessing information....

*Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del.1985). However, in evaluating whether directors have breached said duty, Delaware courts predicate liability upon "concepts of gross negligence." *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984). With respect to the duty of loyalty, directors must act in the interests of the corporation and shareholders, and not in a manner which personally enriches any director at the expense of the corporation.

Generally, when reviewing the action of directors, Delaware courts have applied the business judgment rule which presumes that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company. *Aronson, supra* at 812. However, in recent cases, the Delaware Supreme Court has held that a modified business judgment rule applies when a board addresses matters pending a takeover bid:

"because of the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders."

*Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del.1985).

Recognizing the "inherent danger in the purchase of shares with corporate funds to remove a threat to corporate policy when a threat to control is involved," *Id.* at 955, citing *Bennett v. Propp,* 41 Del.Ch. 14, 187 A.2d 405, 409 (1962), Delaware courts now require directors, when faced with such a conflict to:

... show that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed because of another person's stock ownership. *Cheff v. Mathes* [41 Del.Ch. 494] 199 A.2d [548] at 554–55 [1964].

However, they satisfy that burden "by showing good faith and reasonable investigation...." *Id.* at 555.

*Unocal, supra* at 955. Under Delaware law, reasonable investigation requires that the directors inform themselves "prior to making a business decision, of all material information reasonably available to them." *Aronson, supra* at 812; *Revlon, Inc. v. MacAndrews & Forbes Holdings*, 506 A.2d 173, 181 (Del.1986); *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del.1985). The directors' proof is "materially enhanced" if they show that defensive measures were approved by a board comprised "of a majority of outside independent directors who have acted in accordance with the foregoing standards." *Unocal, supra* at 955. In addition to demonstrating good faith and reasonable investigation, the directors must also show that the defensive measure taken is:

> ... reasonable in relation to the threat posed. This entails an analysis by the directors of the nature of the takeover bid and its effect on the corporate enterprise. Example of such concerns may include: inadequacy of the price offered, nature and timing of the offer, questions of illegality, the impact on "constituencies" other than shareholders (i.e., creditors, customers, employees, and perhaps even the community generally), the risk of nonconsummation, and the quality of the securities being offered in the exchange.

*Unocal, supra* at 955. Once the directors make the above showings, the burden shifts back to the defendants who have the ultimate burden of persuasion to show a breach of the directors' fiduciary duties. *Id.* at 958; *Moran v. Household Intern, Inc.*, 500 A.2d 1346, 1356 (Del.1985).

In the present case, it is clear to the Court that except for some of the amendments to Johnston's employment contract, all of the defensive measures were adopted by Buckhorn's directors only after they learned of Ropak's tender offer. These measures include the poison pill, the ESOP, the new stock option plan, the provisions which accelerate the vesting of all stock options upon a change of control, the severance and stock option plans for key managerial employees, and the specific provisions of Johnston's employment contract which accelerated his pension, stock options and salary upon change of control.

■ Because the above defensive measures were adopted in response to the Ropak offer, the Buckhorn directors have the burden under Delaware law of proving that: (1) the defensive measures were adopted as a result of an informed business judgment based on an evaluation of all material information; (2) they had reasonable grounds to perceive the Ropak offer as a danger to corporate policy and effectiveness; and (3) the defensive measures adopted were a reasonable response to the threat posed by the Ropak offer. The Court will consider each of the above measures separately to determine whether the directors have met their burden. However, before it does so, the Court must first address the defendants' argument that Buckhorn was for sale.

The defendants argue that the board of directors had decided to sell the corporation either in whole or in part and, consequently, had a fiduciary duty to obtain the highest price for its assets. Ropak maintains that the directors breached their fiduciary duty when they failed to negotiate with it while pursuing negotiations with other companies. More importantly, Ropak argues that once the directors decided to sell Buckhorn, their only legitimate purpose was to secure the highest price. Any defensive measures adopted by the directors after this point could be moot because there would be legitimate interest in maintaining Buckhorn as an on-going concern.

In support of these arguments, the defendants direct the Court's attention to *Revlon v. MacAndrews & Forbes Holding, Inc.* In *Revlon*, the board of directors had instituted a series of defensive measures including a poison pill in order to thwart a tender offer by Panty Pride. After these failed, the directors unanimously agreed to a leveraged buyout by a white-knight, Forstmann & Little Co. *Id.* at 178. However, in order to finance the leveraged buy-

out, part of Forstmann's buyout agreement required the sale of two profitable divisions of *Revlon*. *Id.* at 178. The Delaware Supreme Court held that when the directors authorized management to negotiate a buyout with a third party:

> ... the duty of the board ... changed from the preservation of Revlon as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit. This significantly altered the board's responsibilities under the *Unocal* standards. It no longer faced threats to corporate policy and effectiveness, or to the stockholders' interests, from a grossly inadequate bid. The whole question of defensive maneuvers became moot. The directors' role changed from defenders of the corporation bastion to auctioneers charged with getting the best price for the stockholders at sale of the company.

*Id.* at 182. The defendants argue that this case is similar to *Revlon* in that Buckhorn's directors and management had put the company up for sale. Consequently, analogous to *Revlon*, Ropak contends that Buckhorn's defensive measures do not advance any legitimate corporate purpose.

The problem with defendants' argument is that it is not supported by a preponderance of the evidence. Unlike the circumstances in *Revlon*, the Buckhorn directors never authorized any sale of Buckhorn's assets. This conclusion is consistent with Johnston's contacts with other companies prior to the tender offer in which Johnston proposed purchases or business combinations with other companies, not sales of Buckhorn. Once the tender offer was initiated, the directors authorized Johnston to explore a variety of defensive measures to hinder the Ropak offer, only a few of which involved a sale of Buckhorn or its assets.

As a result of Johnston's efforts, Menasha made an offer to buy Buckhorn's Nes-Tier division. This offer was rejected by the directors. However, they authorized Johnston to continue negotiations in order to determine whether Menasha would increase its price. These negotiations failed

to bear any fruit. The board did not, however, authorize Johnston to make an offer to Menasha, nor did the directors decide to sell Buckhorn or its assets to any other entity. Instead, the directors maintained a consistent policy of keeping the door open on potential sales and evaluated such proposals on a case-by-case basis.

Thus, unlike the facts in *Revlon*, Buckhorn's directors did not inevitably commit themselves to selling any part or all of Buckhorn. *Id.* at 178, 182. After reviewing the evidence, the Court further concludes that throughout the tender offer, the directors' primary objective was to maintain Buckhorn as a going-concern. Therefore, the Court concludes that the directors did not breach a fiduciary duty by refusing to negotiate with Ropak for the sale of Buckhorn. Rather, they were under a fiduciary duty to protect Buckhorn from threats to it as a going-concern. *Unocal, supra* at 955. Having so concluded, the Court will now address the various measures adopted by Buckhorn in response to the Ropak offer.

*Poison Pill*

As discussed earlier, the Buckhorn poison pill was adopted as a defensive measure in response to Ropak's offer. Thus, the directors have the initial burden of demonstrating that they had reasonable grounds for believing that the Ropak offer posed a danger to Buckhorn's corporate policy and, in addition, that the poison pill was a reasonable response to said threat. According to the directors, the purpose of the poison pill was to protect Buckhorn shareholders from Ropak's coercive, two-tiered and inadequate tender offer and to assure for those shareholders on the "back-end" a fair price for their stock. Pursuant to the *Unocal* decision, the Court's first inquiry is to determine whether the directors had reasonable grounds for believing that Ropak's offer posed the imagined threat.

There is no question that the directors understood and appreciated the fact that Ropak's offer, on its face, was a cash offer for any and all shares of Buckhorn. However, notwithstanding their understanding

of the terms of the offer, the directors believed that the offer was, in fact, a two-tiered tender offer. The basis for this belief was rooted in the fact that Ropak had no cash on hand, but instead had to secure financing for the entire transaction. Furthermore, the directors believed that if Ropak could not secure sufficient financing to purchase all the shares or, alternatively, if some shares were not tendered, Ropak would exchange Ropak securities for the Buckhorn stock held by these shareholders. Given the debt structure of Ropak, which would only be increased by the acquisition of Buckhorn stock, the directors were concerned that the Ropak securities which these shareholders would receive would be of less value than the Buckhorn securities. These concerns were buttressed at the December 6 meeting by Mr. Downen, Buckhorn's investment banker, who was skeptical about Ropak's ability to secure financing for the entire acquisition and about the quality of the Ropak securities exchanged for non-tendering and "back-end" Buckhorn shareholders.

■ The Court does not believe that the directors' fears about the potential two-tiered nature of the Ropak offer and its impact on back-end or non-tendering shareholders were unreasonable. The directors concerns were based upon the business judgment possessed by a group of experienced, outside directors. Their opinions were bolstered by the professional advice of an investment banker who had reviewed the financial statements of Ropak. Thus, the Court concludes that the directors had reasonable grounds for believing that the interests of nontendering and "back-end" shareholders were jeopardized by Ropak's tender offer.

■ The directors also believed that Ropak's offer was inadequate. This belief was based on several grounds. First, many of the directors were familiar with the history of Buckhorn and were aware that the company had recently engaged in significant streamlining and had received some important new orders. Thus, they reasonably concluded that Buckhorn's performance would probably improve in the future and that its current stock price was undervalued. In addition, the directors also heard a presentation from BEL involving three different valuation analyses. Although these analyses indicated that Ropak's offer fell somewhere in the midrange of the valuations performed by BEL, it was not unreasonable for the directors to accept BEL's assessment based on these analyses that Ropak's offer was inadequate. Finally, Johnston performed a crude break-up analysis for the directors at the December 6 meeting which also indicated that Ropak's offer under-valued Buckhorn. Considering the amount of financial information presented to them at the December 6 meeting, and giving due deference to the directors own professional judgment and knowledge of Ropak, the Court believes that the directors' conclusion about the adequacy of Ropak's offer was arrived at "in good faith and after reasonable investigation." *Unocal, supra* at 955.

■ In response to the threat posed by Ropak's offer, the directors adopted the poison pill in question. Courts have repeatedly held that adoption of a poison pill is a reasonable response by directors when they believe that the price offered is inadequate and threatens the interests of shareholders. *See Harvard Industries, Inc. v. Tyson* [Current] Fed.Sec.L.Rep. ¶ 93,064 (E.D.Mich. Nov. 25, 1986); *Revlon, supra* at 180–181; *Moran, supra* at 1356–57; *Unocal, supra* at 955–956. Whereas the directors had reasonable grounds for their belief that Ropak's price was inadequate and that Ropak's offer threatened the interests of non-tendering shareholders because of the two-tiered nature of the offer, the Court believes that the directors' decision to adopt a poison pill was a reasonable response to the threat perceived.

This conclusion does not end the Court's inquiry, however. The defendants also challenge the prices set by the directors when they adopted the poison pill. More specifically, the defendants argue that the trigger prices of $6 and $10 for common and preferred shares, respectively, are un-

reasonably high and are not based upon any reasonable grounds.

In considering this matter, the Court must determine whether the directors have shown that they acted in good faith and on reasonable grounds in approving the poison pill with the $6 and $10 prices for common and preferred stock. The Court is mindful that when the directors embarked upon the task of establishing the price of Buckhorn's stock, they "assumed a great deal of responsibility by providing a substitute for the marketplace which ordinarily would judge the merits of [Ropak's], and any other potential acquiror's, tender offer." *MacAndrews & Forbes v. Revlon, Inc.*, 501 A.2d 1239, 1347 (Del.Ch.1985).

Obviously, if the directors failed to make an informed decision and the poison pill is overpriced, it becomes a "show-stopper" which ultimately prevents the shareholder from obtaining a fair market price for his or her stock. *See Dynamics Corp. v. CTS Corp.*, 805 F.2d 705, 714 (7th Cir.1986). Thus, it becomes critical that the directors demonstrate that they used due care in arriving at their decision. Under Delaware law, this means that the directors must show that they informed themselves "prior to making a business judgment decision, of all material information reasonably available to them." *Van Gorkom, supra,* at 872–873. *See also* Wander and LeCoque, *Boardroom Jitters: Corporate Control Transactions and Today's Business Judgment Rule,* 42 Bus.Law. 29, 32–41 (1986).

The record in this case indicates that management first submitted the poison pill to the directors for approval on December 13. However, prior to the meeting the directors had only received a summary of the poison pill. Consequently, the directors properly declined to consider the proposed poison pill, but requested a copy of the plan.

On December 17, the directors convened a telephonic directors' meeting for the purpose of considering adoption of the proposed poison pill. The only information they relied upon in making their decision was a conclusory letter from BEL recommending the prices of $6 and $10 and an internal memorandum from Carl McLaughlin dated December 10 which indicates that the price of common shares should be approximately $6 per share. The record indicates that there was no discussion or inquiry by the directors as to what the bases for these prices were or as to how BEL or McLaughlin arrived at their recommendations. After approving the poison pill, the meeting was adjourned. The entire meeting lasted approximately thirty minutes.

■ As discussed above, because the directors were making a decision which would effectively preempt the marketplace, they assumed a great deal of responsibility which made it imperative that they make an informed decision concerning the value of Buckhorn stock. However, the evidence indicates that the directors failed to apprise themselves of material facts reasonably available which cast substantial and serious doubt on the reasonableness of the prices set in the poison pill.

Had the directors made a reasonable inquiry into how BEL and McLaughlin arrived at their price recommendations, they would have discovered the following:

1) BEL had done little, if any, independent analysis of the valuation figure used as the basis for the $6 and $10 prices;

2) BEL relied exclusively on the break-up analysis presented by Johnston at the December 6 directors' meeting as the basis for computing the price of Buckhorn's stock;

3) BEL made no attempt to verify or document the assumption that NesTier could be sold for $45 million or that any of the other assets could be sold at prices assumed by Johnston;

4) BEL failed to incorporate into the break-up analysis costs which the directors knew would have to be deducted from Johnston's break-up analysis, such as liquidation costs, tax effects, and the time value of money; and

5) McLaughlin's analysis estimated the value of NesTier by using the revised budget projection of $4 million in net profits for 1987 and multiplying this

by a factor of eight. However, the 1987 revised budget projection had never been discussed or approved by the directors and, given Buckhorn's track record of substantially overestimating its budget projections in prior years, is highly questionable. Moreover, McLaughlin used a factor of eight to arrive at a value for NesTier even though Buckhorn's investment banker considered a factor of six as more appropriate. McLaughlin did so upon the instruction of Johnston.

Obviously, the above information is highly relevant to the assessment of the reasonableness of the prices set in the poison pill. Each of the facts could have and should have been discovered upon reasonable inquiry by the directors. By failing to make such inquiry, the directors here, as in *Van Gorkom,* failed to adequately inform themselves of Johnston's role in setting the prices for Buckhorn's stock and of the material deficiencies in the assumptions and methods employed to arrive at such prices. *See Van Gorkom, supra* at 874. On these facts, the Court concludes that the directors have failed to establish that they exercised due care to make an informed business judgment in pricing Buckhorn common and preferred stock at $6 and $10, respectively.

Unfortunately, the directors neglect of their fiduciary duty did not end here. Compounding their failure to make reasonable inquiry on or before the December 17 meeting was their failure to act upon or inquire about a subsequent liquidation analysis prepared by McLaughlin. This analysis, prepared prior to the December 17 meeting, was not disseminated to the directors until after the meeting. This second analysis indicated that the liquidation value for Buckhorn, even under Johnston's questionable set of assumptions, was only $22.5 million. The Court views the $4 million difference between the December 10 and December 17 analyses as material since it would require a significant reduction of the triggering prices set in the poison pill. At the very least the directors' fiduciary duty called for them to make some type of inquiry with respect to this matter, but none was forthcoming.

Considering all of the above evidence, the Court concludes that the directors have failed to demonstrate that they informed themselves of material information reasonably available to them when they approved the poison pill. This information seriously calls into question the reasonableness of the prices set in the poison pill. Absent proof that they made an informed decision, the directors cannot carry their burden under either part of the *Unocal* test since they cannot show that they made their decision on reasonable grounds, nor can they show that the prices set were a reasonable response to their concerns for the interests of the shareholders. Whereas the plaintiff and counterclaim defendants have failed to meet this burden, the Court concludes that the defendants are entitled to an injunction with respect to Buckhorn's poison pill.

*ESOP*

■ Unlike poison pills or golden parachutes, employee stock ownership plans serve a number of legitimate, non-control oriented corporate purposes. *Norlin Corp. v. Rooney, Pace, Inc.,* 744 F.2d 255, 266 (2d Cir.1984). However, it is clear that when shares of corporate stock are purchased for an ESOP and placed under director or management control during the course of a tender offer, as in the present case, the same conflict of interest which arises in more obvious defensive measures is also inherent in the creation of an ESOP. *Id.* at 266; *see also Unocal, supra* at 955. Thus, while it is certainly permissible for the directors to adopt measures for the benefit of its employees during the midst of a corporate control struggle, the directors must show that "there are rationally related benefits accruing to the stockholders" from adopting such measures. *Revlon, supra* at 182. Furthermore, the Court believes that it is appropriate to look at such factors as "the timing of the ESOP's establishment, the financial impact upon the company, the identity of the trustees and the voting control of the ESOP shares" in determining whether the ESOP

was created to benefit the employees and not simply to further entrench management. *Norlin, supra* at 266.

In the present case, the record is clear that the directors approved the ESOP only after Ropak's tender offer was announced. The idea of creating an ESOP was discussed for the first time by the directors at the December 6 meeting and was conceptually approved without any significant discussion or a draft of the plan. Although the amount of shares eventually approved was relatively small, it is significant that these shares were purchased on the open market and placed in the control of the two management trustees. It is also interesting to observe that these shares were purchased from Buckhorn shareholders at market prices hence below the Ropak offer even though the directors had earlier determined that the Ropak offer was inadequate and would be unfair to the shareholders. Finally, there is no evidence in the record as to how the ESOP would benefit the shareholders nor as to how Ropak's tender offer posed a threat to Buckhorn's employees.

Given the record before it, the Court concludes that the directors adopted the ESOP in order to thwart Ropak's tender offer and to entrench Buckhorn's management. Moreover, the directors have failed to demonstrate, let alone articulate, what threat was posed to its employees as a group or how establishment of the ESOP would benefit its shareholders. Indeed, given the directors' rejection of Ropak's offer as inadequate, the directors' decision to purchase shares in the open market from its shareholders seems directly contrary to the shareholders' interest. Therefore, the Court concludes that the directors have failed to meet their burden under *Unocal.* Accordingly, the Court finds that the defendants are entitled to an injunction of Buckhorn's ESOP.

*Key Employee "Golden Parachutes"*

Like the previous measures, the directors approved stock options and severance agreements for its six key management employees in response to the Ropak tender offer. Not only were new stock options granted to these employees, but they were also granted the right to accelerate their existing options as well as their newly acquired options. In addition, the employees were granted severance agreements which were triggered only upon a change of control. The cost of the latter measure, if triggered, would be approximately $750,-000.

In approving the golden parachutes, the directors were concerned about the possibility of losing its key management at a critical time of transition. Five of these six individuals had just moved to Cincinnati and were key players in terms of Buckhorn making the transition from a holding company to an operating company. Evidence was presented to the directors by Johnston and Joyce which indicated that these key managers were concerned about the threat to their job security posed by Ropak's offer and a possible change of control. Thus, the directors approved stock options and severance payments which accelerated upon a change of control. In viewing the evidence, the Court believes that the directors have met their burden of showing that they had a good faith belief based upon reasonable grounds that Ropak's tender offer posed a threat to its key management employees. *Unocal, supra* at 955.

The directors also have a burden of showing that the measures adopted were reasonable in relation to the threat posed. The Court believes that the directors have met this burden with respect to the severance plans. Although it is true that these agreements become effective only upon a change of control, the managers are only entitled to their severance pay if, within twelve months of the change of control, they are fired or are constructively discharged. Thus, there is no cost to the shareholders as long as the managers are allowed to retain their present position for one year after a change of control. The Court believes that this provision reasonably advances the shareholders' interest in retaining key management personnel in their present positions during a critical transition period, without unduly entrench-

ing management or over-burdening Ropak. Furthermore, the agreements provide that the size of the payments are limited by section 280G of the Internal Revenue Code. This provision provides some assurance that the severance payments would be reasonable in the event that they are exercised.

In contrast, the Court does not believe that the directors have met their burden of showing that the new stock options, and amendments of existing stock options to allow vesting upon a change of control, are reasonable measures in relation to the threat posed. Again, the threat here is the potential departure of its key employees in the face of an uncertain future. In the face of this threat, the directors have provided these key employees with guaranteed employment or significant severance pay for up to one year after a change of control. Issuing of an additional 100,000 stock options and accelerating the vesting these options, as well as the employees' outstanding stock options, upon a change of control does little to add to the job security of these employees. However, it causes demonstrable harm to the shareholders since it significantly dilutes shareholder equity. Such dilution would be acceptable if the shareholders would benefit but, here, the directors have made no showing that any benefits would accrue to the shareholders that would not otherwise accrue to them from the severance pay agreements.

Moreover, even if the directors could show some value derived from granting new stock options to these employees, there is no evidence that accelerating these options upon a change of control would advance any legitimate corporate interest. Rather, by allowing incentive-based employee stock options to accelerate and vest regardless of employee performance appears to this Court to be contrary to the interests of the shareholders. Therefore, the Court concludes that the directors have not shown that granting the employee stock options and amending all existing stock options to allow acceleration upon a change of control are reasonable responses to the threat posed by the Ropak offer. It

follows, therefore, that the defendants have demonstrated a substantial likelihood of success on the merits with respect to this aspect of the the golden parachutes adopted by the directors.

*Johnston's Amended Employment Contract*

The final defensive measures for the Court to consider are the various amendments to Johnston's employment contract. Before considering the merits, the Court must first address whether Delaware's traditional or modified business judgment rule applies. Relying upon *Moran,* the directors argue that the traditional business judgment rule spelled out in *Aronson* applies because the various amendments adopted by the board on November 19 were drafted prior to Ropak's tender offer. *Moran* involved:

... a defensive mechanism adopted to ward off possible future advances and not a mechanism adopted in reaction to a specific threat. This distinguishing factor does not result in the Directors losing the protection of the business judgment rule. To the contrary, pre-planning for the contingency of a hostile takeover might reduce the risk that, under the pressure of a takeover bid, management will fail to exercise a reasonable judgment. Therefore, in reviewing a pre-planned defensive mechanism it seems even more appropriate to apply the business judgment rule.

*Id.* at 1350.

Upon review of the above authority, the Court agrees with the directors that some of their actions taken with respect to Johnston's employment agreement fall within the scope of the traditional business judgment rule. More precisely, it is clear that the amendments which granted Johnston stock options and a supplemental pension were considered prior to November. These amendments represent a response to events that were unrelated to Ropak's tender offer. These events included the directors' decision to eliminate a pension plan for its salaried employees and Johnston's decision on October 30, 1986 to turn in his 235,000 shares of Buckhorn stock

because of the tax liability associated with the zero interest loan Buckhorn made to Johnston for the purchase of said stock. In response to these events, the directors created a separate pension for Johnston and granted him stock options to purchase 235,000 shares of common stock. Whereas the evidence clearly demonstrates that these measures were contemplated by the directors prior to the tender offer and were unrelated to change of control, the Court believes that it is appropriate to apply the traditional business judgment rule. Thus, the burden is upon the defendants to show that the directors were grossly negligent in adopting the above changes. *Moran, supra* at 1356.

Here, the evidence indicates that the directors had discussed the above problems prior to the November 19–20 meeting and were aware of the relative costs of each amendment. They believed that it was important to provide a supplemental pension to the chief executive office, particularly since he was approaching retirement age, and that granting stock options would provide him with performance incentives. They also did not believe that the latter measure would affect shareholder equity since Johnston was only receiving stock options for 235,000 shares whereas before he had outright ownership of 230,000 shares of stock. On these facts, the Court does not believe that the directors' actions were grossly negligent.

The balance of the changes made to Johnston's employment agreement present a different matter. These changes included the extension of Johnston's employment contract for an additional six years and the acceleration and vesting of his stock options and pension rights upon a change of control. In addition, the directors also added a severance pay clause which entitled Johnston upon a change of control to receive the present value of his future salary due him under the terms of the agreement. The evidence indicates that none of the above amendments were discussed or contemplated by any director other than Mr. Schwartz prior to the November 19–20 directors meeting. Moreover, each of these amendments clearly relates to Ropak's tender offer and, as attested by many directors, was adopted in response to said offer. Under these circumstances, the Court concludes that the directors have the burden of making the requisite two-part showing under *Unocal.*

The record indicates that the directors adopted the above amendments for two reasons. First, the directors believed that Buckhorn's future was tied to Johnston's performance and thus, it was important to retain Johnston as a chief executive officer. Second, as discussed earlier, the directors believed that the Ropak offer was ill-timed and threatened Buckhorn's transition from a holding company to an operating company by creating a substantial amount of instability and uncertainty. Accordingly, the directors thought it was important to provide Johnston with performance-oriented incentives, such as stock in the company, as well as to provide job security for Johnston in light of the uncertainty created by Ropak's offer. None of these concerns were unreasonable, nor were the directors' objectives of the illegitimate.

The question then is whether the means chosen were reasonable in relation to the threat perceived. With respect to the directors' decision to accelerate Johnston's stock options upon a change of control, the Court notes that the directors granted *Johnston* these options in the first place in order to restore him to his original position prior to October 30, 1986, when he turned in his 230,000 shares of Buckhorn stock. Absent Ropak's tender offer, Johnston would have been able to regain his equity interest by exercising his options over time. However, Ropak's offer threatened to block Johnston from exercising his options. In response, the directors accelerated his options to vest upon a change of control. The Court does not believe that this was an unreasonable response by the directors. Indeed, there was little else they could do in order to effectuate their initial purpose in granting Johnston the stock options. Therefore, the Court concludes that the directors have met their burden under *Unocal.* Having met this

burden, it is incumbent upon the defendants to show that the directors were grossly negligent. The Court concludes that they have not made such a showing.

However, the Court does not believe that the directors have demonstrated that their decision to allow the acceleration of Johnston's salary and pension upon a change of control and to extend the term of his agreement by six years were reasonable in relation to the threat perceived. Under the terms of the amended agreement, Johnston would be able to receive his severance pay and accelerate his pension plan at-will within seven days after a change of control. Assuming that Johnston is a valuable manager, an assumption that must be valid otherwise none of the above amendments would be beneficial to the shareholders, its strikes the Court that the "at-will" nature of these amendments is at odds with this assumption and is contrary to the shareholders' interests.

This conclusion flows from the observation that the directors have a duty to its existing shareholders and those shareholders either caught on the back-end of Ropak's offer or who choose not to tender. Indeed, it was the directors' concern for the latter two groups of shareholders which prompted them to adopt the poison pill. However, if a change of control occurs, the "at-will" provisions of these amendments would allow Johnston to quit or retire with significant cost to the corporation, even though his services may still be needed or required. Such a result is necessarily at odds with the interests of the "back-end" and non-tendering shareholders whose interest the directors attempted to scrupulously protect by adopting the poison pill. Had these amendments not been "at-will," but drafted more like the severance agreements for Buckhorn's six key employees, the Court might take a different view. In their current form, however, the Court can only conclude that the directors' response was not reasonable in relation to the threat posed, since it substantially drives up the cost of the acquisition to Ropak without benefiting the interests of the shareholders. Indeed, the only interests which appear to be advanced by these provisions are those of Johnston.

The same conclusion follows with respect to the extension of the term of Johnston's employment. The directors have failed to demonstrate why Johnston's existing employment contract, which lasts for another four years, does not provide him with sufficient security to encourage him to stay with Buckhorn during its troubled times. On the other hand, extension of Johnston's employment agreement substantially increases the costs of acquisition and harms the interests of non-tendering shareholders since the size of the payments Johnston would receive from the acceleration of his pension payments and his severance pay are based on the length of his employment contract. Whereas the directors have failed to demonstrate that the acceleration of Johnston's pension and salary upon a change of control and the extension of the term of his contract were reasonable responses to the threat posed by Ropak's tender offer, the Court concludes that the defendants have shown a substantial likelihood of success on the merits with respect to these amendments.

Summarizing the above, the Court concludes that the defendants have shown a substantial likelihood of success with respect to the amendments to Johnston's contract which extended its term, as well as those provisions which accelerated his pension rights and severance pay upon the change of control. However, the defendants have not shown a substantial likelihood of success with respect to the directors' decision to provide Johnston with a pension plan or to grant him stock options which accelerate upon the change of control.

*Equities*

In addition to showing that they have prevailed or are likely to prevail on the merits, the defendants must also demonstrate that, absent injunctive relief, they will be irreparably harmed. The Court must also weigh whether issuance of an injunction would cause harm to others and whether it would serve the public interest.

In this case, failure to enjoin Buckhorn's poison pill would effectively kill the tender offer. Not only would this cause irreparable harm to Ropak, it would also deprive Buckhorn's shareholders of the benefit of the marketplace. In addition, the Court finds that adoption of the ESOP and the various defensive measures which are effectuated only upon a change of control would impose substantial costs upon Ropak and would harm the interests of non-tendering Buckhorn shareholders.

Second, the Court believes that injunctive relief can be crafted to limit the degree of harm to the legitimate interests of the directors and shareholders of Buckhorn while allowing the Ropak offer to proceed and be judged on its merits by the shareholders and the marketplace. Such a goal necessarily advances the public interest.

As in the case of most corporate control cases, there is no adequate remedy available at law to the defendants because of the virtual impossibility of determining and awarding damages after the harm is inflicted. Thus, equitable relief is not only appropriate, it is essential.

## CONCLUSIONS OF LAW

A. The Court has jurisdiction of this action under the provisions of 28 U.S.C. § 1332.

■ B. The plaintiff Buckhorn and counterclaim defendants have failed to show either that they had reasonable grounds for believing that the Ropak offer posed a threat to corporate policy or that their actions taken in adopting the poison pill and ESOP were reasonable in relation to said threat. Therefore, the defendants have prevailed on the merits with respects to these defensive measures.

■ C. The plaintiff Buckhorn and counterclaim defendants have also failed to show either that they had reasonable grounds for believing that the Ropak offer posed a threat to corporate policy or that their actions taken in approving stock options which accelerated upon a change of

control for Buckhorn's managerial employees and approving amendments to Johnston's employment contract which accelerated his pension and severance pay rights upon a change of control and granted him an extended contract were reasonable in relation to said threat. Therefore, the Court concludes that the defendants have shown a substantial likelihood of success on the merits with respect to these measures.

D. The plaintiff Buckhorn and counterclaim defendants have shown that they had reasonable grounds for believing that the Ropak offer posed a threat to corporate policy and that their actions taken in approving the severance pay plan for six key managerial employees and granting Johnston an acceleration of his stock options upon a change of control were reasonable in relation to the nature of the threat posed. The defendants have failed to show that the directors were grossly negligent in adopting these measures. Therefore, the Court concludes that the defendants have not shown a likelihood of success on the merits with respect to these defensive measures.

E. The defendants have failed to show that the plaintiff Buckhorn and counterclaim defendants were grossly negligent in amending Johnston's employment contract by granting him stock options and providing him a pension plan. Therefore, the Court concludes that the defendants have not shown a likelihood of success on the merits with respect to these defensive measures.

F. The defendants have shown that they and Buckhorn's shareholders will be irreparably harmed if the defensive measures described in paragraphs B and C are not enjoined.

G. The Court further concludes that enjoining the defensive measures described in paragraphs B and C would not cause substantial harm to the plaintiff and counterclaim defendants, but would advance the interest of the shareholders and would serve the public interest.

237

H. The defendants have demonstrated that they do not have an adequate remedy at law.

WHEREUPON, upon consideration and being duly advised, the Court finds defendants' motion to permanently enjoin the Shareholder Rights Protection Plan and the Employee Stock Ownership Plan approved by the board of directors of Buckhorn, Inc. to be meritorious and it is, therefore, GRANTED. The Court hereby ENJOINS AND DECLARES UNENFORCEABLE the Shareholder Rights Protection Plan. The Court further ENJOINS the voting of the shares held by the trustees of the Employee Stock Ownership Plan the inclusion of these shares in determination of the number of shares outstanding for majority or control purposes, and the acquisition of any additional shares for the Employee Stock Ownership Plan.

FURTHERMORE, the Court finds defendants' motion for a preliminary injunction to be partially meritorious. The Court hereby ENJOINS AND DECLARES INVALID the following:

a) The amendment to Johnston's employment agreement which extends its term until 1992;

b) The amendments to Johnston's employment agreement which allow Johnston to receive the present value of his future salary and the immediate funding of his pension supplement upon a change of control event;

c) The amendments to all existing Buckhorn stock options plans pursuant to which all outstanding options may be exercised upon a change of control; and

d) The exercise of stock options to purchase Buckhorn stock granted to the six key managerial employees pursuant to the approval of the directors on November 19, 1986.

In all other respects, defendants' motion for a preliminary injunction is DENIED. Thus, the Court does not enjoin the severance agreements for Buckhorn's six key managerial employees, Johnston's supplemental pension, or the exercise upon a change of control of the 235,000 stock op-

tions granted to Johnston by the board of directors on November 19, 1986.

IT IS SO ORDERED.