The BLACK & DECKER CORPORA-
TION, a Maryland corporation, and B
& D Acquisition Inc., a Maryland cor-
poration, Plaintiffs,

v.

AMERICAN STANDARD, INC., a Dela-
ware corporation, and Charles M. Ober-
ly, III, Attorney General of the State of
Delaware, and Michael E. Harkins, Sec-
retary of State of State of Delaware,
Defendants.

Albert OMINSKY, Trustee, Edith Citron,
Jerome S. Blumenthal, Harry Lewis
and Stephen Dobrow, individually and
on behalf of all others similarly situ-
ated, Plaintiffs,

v.

AMERICAN STANDARD, INC., William
R. Boyd, Paul Bancroft, Richard M.
Cyert, Dirk de Bruyne, Edward Donley,
Louis Fernandez, James F. Lardner,
Richard A. Lenon, William A. Mar-
quard, Donal J. Phillips, Eugene J. Sul-
livan and William J. Young, Defend-
ants.

Civ. A. Nos. 88–50 LON, 88–104 LON.

United States District Court,
D. Delaware.

March 16, 1988.

Rodman Ward, Jr., Stephen P. Lamb, Edward P. Welch, David A. Margules, of Skadden, Arps, Slate, Meagher & Flom, Stephen D. Goldberg, of Theisen, Lank, Mulford & Goldberg, Wilmington, Del. (Robert E. Zimet (argued), Jay B. Kasner, Anne W. Crawford, of Skadden, Arps, Slate Meagher & Flom, New York City, George Beall, Mark D. Gately, Ty Cobb, of Miles & Stockbridge, Baltimore, Md., of counsel), for plaintiffs.

Jesse A. Finkelstein, Daniel A. Dreisbach, of Richards, Layton & Finger, Wilmington, Del. (John L. Warden (argued), Robert J. Katz, William R. Norfolk, Karen Ann Popp, Rena J. Moulopoulos, of Sullivan & Cromwell, New York City, of counsel), for defendant American Standard Inc.

A. Gilchrist Sparks, III, Kenneth J. Nachbar, Michael Houghton, and Robert J. Valihura, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendants Oberly and Harkins.

Kevin Gross, of Morris, Rosenthal, Monhait & Gross, Wilmington, Del. (Harry A. Brachtl (argued), of Lowey, Dannenberg & Knapp, Joshua N. Rubin, Arthur Abbey, of Abbey & Ellis, New York City, of counsel), for class action plaintiffs.

## OPINION

LONGOBARDI, District Judge.

On February 2, 1988, The Black & Decker Corporation ("Black & Decker") and B & D Acquisition Inc. ("B & D Acquisition" sometimes collectively referred to as "Black & Decker"), an indirect wholly-owned subsidiary, commenced a lawsuit against American Standard Inc. ("American Standard"), Charles M. Oberly, III, Attorney General of the State of Delaware, and Michael E. Harkins, Secretary of State of the State of Delaware ("Oberly and Harkins"), contesting the constitutionality of 8 Del.C. § 203 and seeking declaratory and injunctive relief. On February 23, 1988, this Court denied Plaintiff's motion for a preliminary injunction on the ground that Black & Decker failed to demonstrate irreparable harm. *See The Black & Decker Corporation v. American Standard, Inc.,* 679 F.Supp. 1183 (D.Del.1988).

On February 9, 1988, Defendant American Standard filed its answer and a counterclaim seeking a declaratory judgment that its non-redeemable Interim Protection Rights Plan ("Rights Plan" or "Poison Pill") was valid. On February 24, 1988, Black & Decker filed a reply and counterclaims alleging violations of Delaware law in connection with American Standard's approval of a Recapitalization Plan and adoption and amendment of its Rights Plan. On February 24, 1988, Plaintiff moved this Court for preliminary injunctive relief with respect to the Rights Plan and the Recapitalization Plan. In a companion case, the

shareholders of American Standard ("Class Plaintiffs") on February 23, 1988, filed a class action suit seeking similar relief in addition to alleging violations of Sections 14(e) and 10(b) of the Securities and Exchange Act of 1934.

The briefing on an accelerated basis has been completed and oral argument was heard on March 7, 1988. This is the Court's decision on Plaintiff's motion for a preliminary injunction.

## BACKGROUND

In late November, 1987, Black & Decker approached William A. Marquard, director and former Chairman of American Standard to discuss Black & Decker's acquisition of American Standard. From November until the present date, Black & Decker has repeatedly written and called American Standard's Chairman, William B. Boyd, in order to arrange a meeting to discuss a business combination between Black & Decker and American Standard. In early January, Boyd called Nolan Archibald, Chairman of Black & Decker, and stated that "he was not interested in pursuing a business combination of Black & Decker and [American Standard]." Docket Item ("D.I.") 47C at 1254.

On January 27, 1988, Black & Decker commenced an all cash tender offer for all the shares of American Standard at $56.00 per share. On the very day of the offer, Boyd retained Goldman, Sachs & Co. ("Goldman Sachs") to serve as American Standard's investment advisor and to work in conjunction with Sullivan & Cromwell, outside legal counsel, on the newly announced offer. The formal retainer letter was signed by Boyd on February 4, 1988. D.I. 47B at 754. Without knowing the details, without Board approval, it is obvious from the contents that Goldman Sachs and Boyd had definite ideas about how to resolve the hostile takeover attempt by Black & Decker. As it was presented to the Board on February 4, 1988, the keystone of the proposed defensive tactics to be adopted was a recapitalization plan which, if implemented, would earn Goldman Sachs $17,500,000.00. Interestingly,

anticipating its success, Goldman Sachs also provided additional compensation for itself in the event assets were sold after the recapitalization. D.I. 47B at 755.

### February 4, 1988 Meeting

At the February 4 meeting, the Board began considering the issues surrounding the Black & Decker offer. The directors received copies of a summary of the Interim Rights Plan and a copy of the Goldman Sachs' presentation entitled Project Lion at the meeting. Deposition of Edward Donley, D.I. 47B at 989–99.

The Goldman Sachs presentation, which took about an hour, covered (i) an analysis of Black & Decker's offer, including Black & Decker's capability of completing the offer and the tender offer timetable; (ii) the valuation of American Standard in terms of the price of its common stock and trading history and in terms of a summary analysis by division; (iii) a discussion of the various responses available to American Standard; and (iv) a discussion of selected alternatives, including a recapitalization and White Knights. D.I. 57B at 362–410.

The Goldman Sachs' report concluded with a range of values for American Standard on a per share basis. This valuation, however, is "before pensions adjustments, other assets and liabilities, transaction costs or taxes." D.I. 57B at 389.

The Sullivan & Cromwell presentation on the Poison Pill followed the Goldman Sachs presentation and lasted a little less than an hour. Donley Dep., D.I. 47B at 901. Sullivan & Cromwell based its presentation upon a three page summary of terms which was distributed to the directors. *Id.* at 558–61. The Poison Pill called for a dividend of one contingent Right in respect to each share of common stock held of record as of February 19, 1988, and also authorized the issuance of one Right in respect of each share of common stock that was outstanding after February 19, 1988. Each Right entitled the holder thereof to purchase 5 shares of American Standard common stock for $28.00 a share when one party acquired 30% or more of the outstanding common stock. D.I. 66 at 2070–72. Any Rights owned by the person who

crossed the 30% threshold would be void for all purposes. *Id.* Unless the trigger date had occurred, the expiration time was set for March 16, 1988. *Id.* The Board of Directors could extend the expiration date until June 30, 1988, if the Board deemed it necessary in order to pursue a course of action which would result in enhanced value for the shareholders. *Id.* The Poison Pill could also be amended without the consent of the shareholders in order to cure any ambiguities or to make any change that did not materially affect the holders' interest adversely, or in any way at the time the expiration date is extended. *Id.* The Rights Plan was not redeemable.

During its presentation, Sullivan & Cromwell explained that the Poison Pill had a twofold purpose: (i) to give the directors of American Standard more time to consider other reasonable alternatives that would enhance shareholder values, Deposition of William B. Boyd, D.I. 47A at 24, and (ii) to prevent a possible street sweep by Black & Decker. *Id.* Boyd explained that the non-redeemability of the Rights Plan was in the shareholders' best interest because "the board and management can spend its time looking at reasonable alternatives and not have to think about redeeming the rights as a result of subsequent action." *Id.* at 50. The purpose of the plan was that "to have a level playing field it was necessary to give a moderate amount of time to offer bidders, including possibly the company itself, and that a rights plan of this type which ran, I think, until mid-March, would permit a short but adequate amount of time for alternative propositions to be developed." Donley Dep., D.I. 47B at 921. It is clear from the testimony that the "company" referred to was American Standard.

Although the Poison Pill was adopted to facilitate the pursuit of reasonable alternatives, the testimony of one of the directors suggests that no alternatives were being pursued and that the Board was only considering the Recapitalization Plan. Indeed, as of February 18, the Board had not considered alternatives to the Black & Decker offer other than the Recapitalization Plan. In response to the question as to whether Goldman Sachs should be permitted to provide confidential non-public information to industrial firms or leveraged buy out companies, the Chairman of American Standard stated: "I expressed the belief that we should not foreclose the future possibilities and alternatives that might have to be examined by the board and that under certain circumstances and with proper safeguard, we may wish to release information." Boyd Dep., D.I. 66, at 1665. As of February 18, the Chairman testified that the Board was under no "obligation to consider reasonable alternatives to Black & Decker's offer." Boyd Dep., D.I. 66 at 1665.

In addition, Goldman Sachs believed that there was the possibility of Black & Decker sweeping the street. Since sweeping the street is a widely publicized takeover tactic, Goldman Sachs saw this as a possible threat to American Standard. Furthermore, Black & Decker, in particular, was capable of sweeping the street once it achieved its financing and passed the timely requirements of Hart–Scott–Rodino.

At the conclusion of the February 4, 1988, Board meeting, the directors retained copies of the Goldman Sachs presentation book to review over the weekend. Donley Dep., D.I. 47B at 924.

On February 5, 1988, Black & Decker increased its offer to $65.00 per share.

*February 8, 1988 Meeting*

The one hour Goldman Sachs presentation followed management's one hour presentation of its five year business plan. Donley Dep., D.I. 47B at 927.

In order to determine the adequacy of Black & Decker's increased offer, Goldman Sachs presented its valuation of American Standard. This valuation, however, was exactly the same one as that presented at the February 4, 1988, Board meeting. *Compare* Goldman Sachs presentation of February 4, 1988, at D.I. 57B at 362–410 with D.I. 57B at 411–452.

Goldman Sachs, furthermore, based its determination that the Black & Decker offer was inadequate on two other factors. First, great interest was shown in the com-

pany by Black & Decker and other possible candidates. Secondly, restructuring the company could yield immediate values exceeding the $65.00 per share offer. Deposition of Thomas Mendell, D.I. 47B at 848. The values for the Recapitalization Plan were increased from the February 4, 1988, Board meeting. Somehow, Goldman Sachs was able to find an additional $5.00. During the presentation of the Recapitalization proposal, the Board expressed concern as to whether the company could be successfully operated at the degree of leverage required. Mendell Dep., D.I. 66 at 1612–13. Based upon its discussions with Goldman Sachs, "the Board unanimously concluded that the $65.00 offer was inadequate and recommended that stockholders reject." Affidavit of William A. Marquard, D.I. 58 at 7.

The presentation of the Poison Pill lasted approximately one half hour. Once again, the twofold rationale for adopting the Pill was set forth and discussed. Boyd Dep., D.I. 47A at 127. At the meeting, Sullivan & Cromwell presented changes in the proposed plan which included raising the exercise price to $32.50 per share and lowering the threshold for triggering the rights to 15%.

### February 10 and 11, 1988

On February 10, 1988, Black & Decker announced that it would begin a consent solicitation to gain control of the American Standard Board. After gaining control, Black & Decker would take action to amend the Poison Pill and make the Rights Plan redeemable.

Following Black & Decker's announcement, American Standard amended the Poison Pill. The amendment provides:

Pursuant to section 4.4(ii) of the Agreement,

Section 4.4(i) of the Agreement is hereby amended to read in its entirety as follows: "in any respect at any time the board of directors acts to extend the 'Expiration Time' [March 16] as provided in the proviso to section 1.1(i) hereof, but no such supplement or amendment so made shall be effective before the time which would have been the Expiration Time in the absence of such extension.

Boyd explained that the amendment was adopted without consultation of the Board because he was advised that the change was not material and that the Poison Pill authorized certain technical changes without consultation. Boyd Dep., D.I. 47A at 116. Notwithstanding American Standard's characterization of the amendment as merely a "technical change", its adoption has the effect of preventing Black & Decker, were it to gain control of the Board, from making the Rights redeemable until after March 16. (This date was later extended by another amendment.)

### February 18, 1988

At the February 18 Board meeting, the Board considered and discussed three separate proposals: Amendment to its retirement and savings plan and the creation of a severance plan, an amendment to the Poison Pill and the Recapitalization proposal. This meeting lasted between two to three hours. Mendell Dep., D.I. 66 at 1617. The Board amended the company's retirement and savings plan and established a severance plan for salaried employees assigned to corporate staff functions in order to provide that, "in the event of a potential change of control" payments will be accelerated under the retirement and savings plan and specified salaried employees will be entitled to severance benefits. D.I. 47C at 1372. This proposal was brought to the Board by the Management Development Committee which was assisted in the formulation and presentation of the proposal by Handy Associates, a professional compensation consultant. Boyd Dep., D.I. 66 at 1709, 1710. Certain financial aspects of the proposed change were discussed by the Board. Id. at 1713. Black & Decker has presented an uncontroverted affidavit which states that these amendments will cost approximately 130 million dollars. Marquard Affidavit, D.I. 58 at 6. American Standard, however, has specifically exempted from the definition of "changes in control" the Recapitalization Plan. D.I. 47C at 1382.

Also at this meeting, the Board adopted the second amendment to the Poison Pill. This amendment extended the expiration date of the Poison Pill to the earlier of June 30, 1988, or the date on which the shareholders vote on the Recapitalization Plan. D.I. 47C at 1507. The amendment further provides that only directors elected at a regularly scheduled annual meeting of the shareholders may terminate the Poison Pill if they determine that it is in the best interest of the shareholders. *Id.* at 1507–08. Thus, the amendment effectively removes the possibility of Black & Decker terminating the Poison Pill before the termination date by gaining control of American Standard pursuant to a consent solicitation.

Testimony revealed that there were three reasons for adopting this second amendment on February 18. The first reason was that the amendment was thought to be helpful in preventing a drop and sweep. Boyd Dep., D.I. 47A at 296. Secondly, the effect of the amendment would be to provide time for the Board to consider reasonable alternatives. Thirdly, the Chairman of American Standard testified that "it also would provide the time for us to get out to our stockholders after approval by the SEC of all the facts relative to our recapitalization program so that the stockholders could make an informed judgment." Boyd Dep., D.I. 66 at 1736–37, 1739.

At this meeting, the Board also discussed and unanimously passed the proposed Recapitalization Plan. Prior to the adoption of the Recapitalization Plan, Goldman Sachs explained and discussed various features of the proposal. The Board discussed the value of the Recapitalization Plan and its effect on any offer from Black & Decker or any other party. Boyd Dep., D.I. 66 at 1875. Several directors also questioned Goldman Sachs about the proposal and the assumptions underlying it. Marquard Affidavit of February 29, 1988, D.I. 58 at 3. Finally, "some directors observed that the proposal was the most conservative and prudent course the Board could follow because it would provide a significant increase in value over Black & Decker's $65 offer while preserving flexibility." Marquard Affidavit of February 29, 1988, D.I. 58 at 10.

Although some discussion was held, it appears that important questions were not asked nor issues raised concerning the Recapitalization Plan and the Employee Stock Ownership Plan ("ESOP"). The Board did not consider the selection of a trustee who will ensure that the ESOP is managed in the best interests of the beneficiaries. Affidavit of Chester A. Gougis, D.I. 63 at 4; Boyd Dep., D.I. 66 at 1688. Furthermore, the Board did not consider the terms of the ESOP setting forth the beneficiaries' rights or the authority of the trustee. Gougis Affidavit, D.I. 63 at 4. In point of fact, a draft plan of the ESOP was not presented to the Board at this meeting and testimony by one of the directors revealed that the drafting of the ESOP had not proceeded far enough to deal with some of these issues. Boyd Dep., D.I. 66 at 1685. In addition, the Board failed to consider whether there was adequate surplus to pay the dividend under the proposed Recapitalization Plan. *Id.* at 1708. Black & Decker points out that the Goldman Sachs' material shows that a $59.00 dividend requires $1,761,000,000.00 in cash. *Id.* at 2038. American Standard does not have enough surplus to pay this dividend. *See* American Standard balance sheet attached to Affidavit of Ann W. Crawford, D.I. 64 at 3.

*Subsequent Developments*

On Tuesday, February 23, 1988, Black & Decker increased its offer to $68.00 and extended its offer to March 7, 1988. In addition, Black & Decker set a new record date for its Consent Solicitation seeking to attain a majority on American Standard's Board.

On March 3, 1988, the Board for American Standard met once again to reconsider the Recapitalization Plan. The Board approved the sale of debentures to Emerson Electric. Marquard Affidavit of March 3, 1988, D.I. 70 at 2. This revision to the Recapitalization Plan will result in the cash component of the dividend increasing to $64.00. *Id.* at 3. The Board believes that "the enhanced recapitalization could pro-

duce total value to shareholders of at least $74 per share, although [Goldman Sachs] did not expect the market to reflect the full value of the plan until full information had been disclosed in the proxy statement and the stockholders have approved it." *Id.* Furthermore, the Board was informed that Goldman Sachs will render a fairness opinion as to the enhanced Recapitalization Plan and "would have expected to do so as to the original plan as well." *Id.* Counsel also advised the Board that "there appeared to exist sufficient surplus for the company to make the distribution to the stockholders provided for in the recapitalization." *Id.* at 4. Lastly, the company had retained a valuation firm to provide the Board an appropriate basis for revaluation of the company and to render an opinion as to whether adequate surplus exists. *Id.*

On March 3, Black & Decker also increased its bid to $73.00 a share and extended the offer until March 17, 1988.

On March 14, 1988, this Court's opinion was literally interrupted by additional developments that have resulted in a modification of the relief sought by Plaintiff. The Court received a hand delivered letter from the Defendant to advise the Court of the factual developments. *See* letter to the Court dated March 14, 1988. The letter stated, *inter alia,* that American Standard expects to receive at least one additional bid over $75.00 per share which is both higher than Black & Decker's offer and the Board's proposed Recapitalization Plan. The Board intends to meet on Wednesday, March 16, to consider competitive bids. In addition, on Sunday, March 13, the Board voted to terminate the Rights Plan if a majority of American Standard's shares are purchased pursuant to a formal tender offer. As a result of these developments, the Court conducted a telephone conference on the afternoon of March 14 in order to ascertain Plaintiff's response. The Court was informed by counsel for Black & Decker that in light of the Board's actions to terminate the Rights Plan if a majority of shares are tendered, Plaintiff was withdrawing its motion for a preliminary injunction with respect to the Rights Plan. Plaintiff's application for injunctive relief as to the severance plan and amendments to the retirement plans, however, remains alive.

On the other hand, Class Plaintiffs informed the Court during the telephone conference that they no longer seek injunctive relief based on the current facts. As a result, the only remaining issue before the Court is whether or not a preliminary injunction as to both the severance plan and amendments to the retirements plan is proper under the circumstances.

*Arguments of the Parties*

Black & Decker argues that the Recapitalization Plan and the ESOP ensures management's control over 55% of American Standard's common stock. Thus, the Board has agreed to a transaction involving the sale of control of the company. D.I. 45 at 50. (Black & Decker suggests that American Standard's Board recognized that a sale of control of the corporation is equivalent to a sale of the corporation. As a matter of fact, American Standard has not contested that pure legal issue. *Id.* at 53.) This contention is supported by the facts that (i) American Standard has amended its "change in control" agreements so that the Recapitalization Plan is exempted; (ii) American Standard's news release of February 18, 1988, explained that management and the ESOP together would control 55% of the company, D.I. 47C at 1399; and (iii) Goldman Sachs presented the Recapitalization Plan as one in which management, together with the ESOP, would own a controlling interest in American Standard. D.I. 66 at 2047. Black & Decker further contends that American Standard has granted itself a lock-up by amending the retirement plans so that, in the event of a change in control, the excess surplus will be dedicated to the retiree group life insurance and medical plans with no reversion of the surplus. Thus, because the Recapitalization Plan is exempted from the definition of change in control, management can utilize the 80 million dollars surplus which Black & Decker cannot. D.I. 45 at 55. In addition, American Standard established an executive severance plan. Black & Decker argues, furthermore, that under *Revlon, Inc. v. MacAndrews & Forbes Holdings,*

506 A.2d 173 (Del.1986), any lock-up must be instituted not to stop or impede bidding, as done here, but to maximize the amount to be received by the shareholders. Finally, Black & Decker contends that as in *Revlon, Inc.*, there has been active bidding for a change in control in American Standard. Black & Decker has raised its bid three times and American Standard has increased the value of its Recapitalization Plan twice.

American Standard, needless to say, counters that the *Revlon* doctrine does not apply to the facts of this case. First, management will not gain control as a result of the Recapitalization Plan. Even on a fully diluted basis, management will control only 24% of the new common shares and the ESOP will control 30% with 46% remaining with the general public. D.I. 57 at 42–43. The Savings Plan and ESOP will be administered by a trustee and each will have "full, confidential, pass-through voting of their American Standard shares (with unallocated shares voted in the same proportion as allocated shares)." *Id.* at 43. Second, American Standard argues that the *Revlon* doctrine does not apply because the Board has acted consistently to preserve the independence of the company and does not, in fact, intend to sell. *Id.* at 45. Third, the Recapitalization Plan does not involve a lock-up condemned by *Revlon* for two reasons: (i) the recapitalization will occur only upon a shareholder vote and shareholders will vote for the recapitalization only if there is not a better outstanding bid; and (ii) management will not obtain a majority of stock under the recapitalization since the ESOP provides for confidential pass-through voting. *Id.* at 46–47. Finally, American Standard's Board, contrary to what Black & Decker would like, does not have a duty to negotiate with an offeror. *Id.* at 48.

*American Standard's Duty to Auction*

Black & Decker's allegations that American Standard has instituted an impermissible lock-up under *Revlon, Inc.*, and that American Standard should be negotiating with Black & Decker, including the disclosure of confidential information, are predicated on this Court concluding that the facts here implicate the *Revlon* principle. In *Revlon*, the court was confronted with a fact situation involving an auction-ending lock-up agreement in the midst of a bidding war between a hostile and a friendly bidder. *Revlon, Inc.*, 506 A.2d at 182. The court pointed out that it was "apparent to all that the break-up of the company was inevitable. The Revlon board's authorization permitting management to negotiate a merger or buy out with a third party was a *recognition* that the company was for sale." *Id.* (emphasis added). Once this happened, "the whole question of defensive measures became moot." *Id.* Consequently, the directors were to take on the role of "auctioneers charged with getting the best price for the stockholders at a sale of the company." *Id.*

The Delaware Supreme Court has recently addressed the *Revlon* principle in *Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334, [current] Fed.Sec. L.Rep. (CCH) ¶ 93,552 at 97,485 (Nov. 18, 1987). In that case, Ivanhoe Partners and Ivanhoe Acquisition Corporation ("Ivanhoe") engaged in a hostile tender offer for 42% of Newmont Mining Corporation ("Newmont") at $105.00 per share. In response to that threat, Newmont adopted a restructuring proposal in order to declare a $33.00 dividend and negotiated a standstill agreement with Consolidated Gold Fields PLC ("Gold Fields"), a major shareholder in Newmont. *Id.* at 97,486. The dividend enabled Gold Fields to sweep the street and acquire 15.8 million Newmont shares, and the standstill agreement ensured both that Gold Fields' interest in Newmont would not exceed 49.9% and that its representation on Newmont's board would be limited to 40%. *Id.* As a result, Ivanhoe's hostile bid was thwarted. The next predictable step was Ivanhoe's seeking a preliminary injunction enjoining the dividend and the street sweep. *Id.* On appeal, the Delaware Supreme Court addressed, *inter alia*, the issue of whether Newmont's directors breached their duties imposed upon them by *Revlon, Inc. Id.* at 97,489.

After explaining the duties of care and loyalty involved when a director acts as an

auctioneer, *Id.* at 97,489–97, 490, the court stated that *"Revlon* applies here only if it was apparent that the sale of Newmont was 'inevitable.' " *Id.* at 97, 490. The court found that *Revlon, Inc.* was inapplicable for two reasons. First, the court pointed out that Newmont was never for sale. "[T]he Newmont board held fast to its decision to keep the company independent." *Id.* at 97, 490; *see also Buckhorn, Inc. v. Ropak Corp.*, 656 F.Supp. 209, 228 (S.D.Ohio 1987) (Unlike the circumstances in *Revlon, Inc.*, the directors of Buckhorn [the target] did not commit themselves to the sale of the company or its assets). Secondly, the court found that there was neither a bidding contest nor a sale. *Ivanhoe* at 97,490. "The only bidder for Newmont was Ivanhoe. Gold Fields was not a bidder, but wished only to protect its already substantial interest in the company. It did this through the street sweep." *Id.* Since Gold Fields' purchases were in the open market (*i.e.*, from private sellers), the court declined to hold that Newmont "sold" the company.[1] *Id.*

The fact the court considered persuasive in finding that the board of directors for Newmont did not "sell" the company was that Gold Fields, because of the standstill agreement, acquired neither a majority of the outstanding voting common stock nor a majority representation on Newmont's board of directors. *Id.* Thus, even after the restructuring proposal was implemented, the public shareholders still controlled the corporation.[2]

▪ In order for the *Revlon* principle to apply to American Standard's proposed Recapitalization Plan, this Court must determine whether the Board intends for American Standard to be for sale or whether there is a bidding contest or a potential

sale. The duty of an auctioneer cannot be imposed upon the Board, until this Court determines that the "sale" of American Standard is inevitable. *Ivanhoe Partners* at 97,490; *Revlon, Inc.*, 506 A.2d at 182 (it was apparent to all that the "break-up of the company was inevitable", and the board's conduct "was a recognition that the company was for sale."); *Freedman v. Restaurant Associates Industries, Inc.*, Del.Ch., C.A. No. 9212, slip op. at 16, Allen, C. (Oct. 16, 1987), [Available on WESTLAW, 1987 WL 14323]. (The board takes on the duty of an auctioneer "once it is clear to the board that the corporation is to be subject to a change in control.") In light of the stage of these proceedings, the question becomes, as in *Ivanhoe Partners*, whether Black & Decker would be successful in showing that American Standard is for sale. That court satisfied itself, in part, on this point by inferring from the decision of the directors to keep the company independent that Newmont was not for sale. *Id.* The court informed this conclusion, however, by finding that the negotiations and final transaction between Newmont and Gold Fields did not result in the sale of the company. *Id.*

In the instant case, it is true that the Chairman of American Standard has testified that the Board intended to keep the company independent. D.I. 47A at 136. Unlike the facts in *Ivanhoe Partners*, however, the record before this Court reveals the probability that the actions taken by the Board, while at the same time mouthing cliches about a desire to remain independent, paint a picture of deliberate actions calculated to culminate in a sale of the corporation.

▪ To reach that conclusion, the first issue that must be resolved is whether a

---

1. The court addressed the fact that Gold Fields used the $33.00 dividend to carry out the street sweep. "Even though Newmont's declaration of the dividend facilitated the street sweep, it did not constitute a 'sale' of the company by Newmont." *Id.* This is because Gold Fields purchases, though using the money from the dividend, were made on the open market from private sellers. The dividend itself was not considered improper since it served its purpose in defending against the coercive tender offer by

distributing the undervalued non-gold assets to *all* of Newmont's shareholders. *Id.* at 97–488 (emphasis added).

2. The general public's voice in the governances of Newmont, in light of Gold Fields' large holdings, was further assured of being heard through Gold Fields and Newmont's agreement to use their best efforts to establish cumulative voting. *Ivanhoe Partners* at 97,486.

transaction which results in a change in control of a corporation amounts to a "sale" under *Revlon, Inc.*[3] It seems unreasonable to conclude that the Delaware Supreme Court would limit the applicability of the duties under *Revlon, Inc.* to only those situations involving the complete sale of all shares of the company. Indeed, the Court of Chancery has recognized that the directors of a company have an obligation to maximize the amount received by shareholders once it is clear to them that the "corporation is to be subject to a change in *control.*"[4] *Freedman v. Restaurant Associates,* Del.Ch., C.A. No. 9212 at 16 (emphasis added). To conclude otherwise would immunize directors from the duty of an auctioneer when forced with a bid involving a two-tiered tender offer because that kind of bid is, in fact, a bid for control of the company followed by a squeeze out merger effectuated through acquired control.[5]

Furthermore, the conclusion that a sale of control amounts to a "sale" under *Revlon, Inc.* is further supported by the facts in *Edelman v. Fruehauf Corp.* Here, the Sixth Circuit, relying upon *Revlon, Inc.,* recognized that the board of directors knew that Freuhauf was on the auction block. *Edelman v. Fruehauf Corp.,* 798 F.2d 882, 884, 886 (6th Cir.1986). In response to the hostile bidder's offer, the board approved a management led leveraged buy out with Merrill Lynch. *Id.* at 884. This was a two-tiered transaction with the first tier being a tender offer for 77% of the company's stock. *Id.* The second tier was a merger of Fruehauf into management's newly created corporation, and the remaining shareholders received securities in the new company. *Id.* at 885.[6] There was no dispute that, if the management led leveraged buy out were permitted to go forward, this would result in the sale of the company. This is true even though management was only acquiring control, *i.e.,* less than 100% of the shares, of Fruehauf.

Finally, the conclusion that a sale of control of a corporation could amount to a sale under *Revlon, Inc.* is not precluded by

**3.** None of the parties has cited authority to support the view that a Recapitalization Plan does or does not trigger the duties required under *Revlon, Inc.* Consequently, based upon the development of the case law under *Revlon, Inc.* and its progeny, this court must determine the course the Delaware Supreme Court would undertake were it confronted with the facts of this case.

**4.** To require that the *Revlon* principle apply only to an offer to purchase 100% of a company's stock would ignore the inevitability of a break-up which could follow a partial tender offer. The effect of a partial tender offer is that "it allows a raider to gain control of a target and hold a minority interest captive, with little protection for the stockholder against self-dealing or a squeeze-out merger." Martin Lipton, "Corporate Governance in the Age of Finance Corporatism", 136 U.Penn.L.Rev. 1, 17–18.

**5.** In a two-tiered tender offer, the raider makes a cash tender offer for a controlling interest in the target and, upon obtaining gaining control, merges the target into itself at a lower second-tier price. Martin Lipton, "Corporate Governance in the Age of Finance Corporatism", 136 U.Penn.L.Rev. 18.

**6.** The management led leveraged buy out in *Fruehauf Corp.* achieves a similar result from the public shareholder's perspective as the Recapitalization Proposal would here. In *Fruehauf Corp.,* as here, the funding for the transaction was derived from loans. *Fruehauf Corp.,* 798 F.2d at 884–85. The leveraged buy out called for a tender offer for only 77% of the company's stock. Section 14(d)(6) of the Securities and Exchange Act of 1934 requires the management led group to take up the shares tendered on a pro rata basis. Section 14(d)(6). Consequently, if more than 77% of the company's shares are tendered, which could be the likely result in a coercive two-tiered tender offer, the shareholders would effectively be exchanging a fraction of their ownership interest in the corporation in exchange for cash. This must be the result since not all the shares tendered will be purchased. In addition, because the second step of the transaction called for a merger of Fruehauf into the management's corporation, the shareholders were merely exchanging their ownership interest in Fruehauf for that in the resulting corporation. There is no doubt that this was considered a sale. Here, the shareholders are exchanging a fraction of their ownership interest in American Standard for cash. This, in turn, results in the general public not having control of the company, as in *Fruehauf Corp.,* yet still retaining some ownership interest. The only difference between the facts before this Court and those in *Fruehauf Corp.* is that the Recapitalization Plan achieves the same result without the second step merger.

*Ivanhoe Partners.* In finding that the Newmont board did not "sell" the company, the court focused on two factors. The Court noted that Gold Fields purchased its stock not from Newmont but from private sellers. *Ivanhoe Partners* at 97,490. Secondly, the court also found it important that by agreement of the parties, Gold Fields would not gain control of the company as a result of the street sweep. (Thus, *Ivanhoe Partners* leaves unresolved the intriguing question of whether the directors would have breached their duty under *Revlon, Inc.* if the adoption of the restructuring proposal and the standstill agreement would have resulted in Golds Fields obtaining a controlling interest in Newmont directly from the company.)

■ Having concluded that a sale of control of a corporation could amount to a "sale" under *Revlon, Inc.,* this Court must consider the Recapitalization Plan. The Recapitalization Plan provides for the distribution to shareholders of $59.00 in cash and $10.80 in face value junior subordinated discount debentures intended to have a $5.00 market value. The shareholders would retain their common shares with the stub equity valued by Goldman Sachs to be between $6.00—$8.00. The total value of the Recapitalization Plan was estimated to be $70.00—$72.00 per share. D.I. 57B at 455. This proposal was to be financed by bank debt, senior subordinated debt, junior subordinated discount debt, proceeds from the sale of the corporate headquarters, common equity and excess cash. D.I. 57C at 456. A necessary element of the Recapitalization Plan is the creation of an ESOP which would purchase 80 million dollars worth of stub equity. D.I. 47C at 1424. The plan also provides that each share of common stock owned by management and the directors would be exchanged for 11.7 shares of the new common stock. *Id.* at 1424. But other shareholders of the corporation would not be entitled to this ex-

change right. As American Standard now exists, public shareholders own 92.6% of the outstanding common stock, management owns 4.8% and the Savings Plan controls 2.6%.[7] D.I. 57B at 465. If the Recapitalization Plan were implemented, the public shareholders would own 45.5% of the outstanding common stock, management would own 23.9% and the Savings Plan and ESOP would control 30.6% of the outstanding common stock.[8]

Needless to say, both parties differ on whether management is gaining control of American Standard through the Recapitalization Plan. Black & Decker would have the Court find that the Recapitalization Plan results in a change in control because management and the combined ESOP and Savings Plan will control 55.5% of the outstanding stock. American Standard, however, contends not only that the options may not be exercised but also that the ESOP and Savings Plan should not be considered in conjunction with the holdings of management since the ESOP and Savings Plan provide for confidential pass through voting.

While both arguments have some merit, this Court must follow its own understanding of the Recapitalization Plan and its effect on the corporation. American Standard is correct to point out that immediately after the Recapitalization Plan has been enacted, the public shareholders will control 55% of the outstanding common stock. Merely stopping at this point, however, does not do justice to the situation faced by American Standard's shareholders. To ignore the presence of the stock options would result in overlooking the complete offer to the public shareholders.

The entire Recapitalization Plan is an offer to gain control of American Standard. American Standard's public shareholders are being offered $59.00 in cash and $5.00 in a bond. In return, they are immediately giving up on a primary basis 40.9% of their

---

7. These percentages are based on a fully diluted basis, assuming that all of the outstanding options are exercised on a primary basis, the general public owns 95.9%.

8. As before, this is on a fully diluted basis, assuming that all of the outstanding options are exercised. In its own news release, American Standard explained that the effect of the Recapitalization Plan to the general public in these terms. D.I. 47B at 1399.

collective ownership interest in American Standard; plus management will receive the exclusive right to remove control from the public shareholders. Thus, while the Recapitalization Plan calls for a reduction in public ownership in American Standard to 55%, it inherently effects the acquisition of control of the corporation. For disclosure purposes and otherwise, American Standard could not describe the transaction in any other way. This right of control in the form of stock options may be exercised at any time without a vote of the public shareholders.

Unlike *Ivanhoe Partners*, this is a sale of control in American Standard. In *Ivanhoe Partners*, the Delaware Supreme Court found that the dividend did not constitute a "sale" of the company by Newmont because all the shareholders received a dividend not just Gold Fields. *Ivanhoe Partners* at 97,488, 97,490. Also, Gold Fields could not purchase control in Newmont and what stock it did buy was not from Newmont but from the market place. *Id.* at 97,490.

The differences from *Ivanhoe Partners* are informative in this case. Unlike the Newmont board of directors, the Board here is not merely declaring a dividend in order to distribute equity built up in the company. Rather, the Board is proposing that each shareholder "sell" a percentage of his or her ownership interest in the company for $59.00 in cash plus $5.00 in a bond. Thus, this situation is more analogous to that in *Fruehauf Corp.*, which was acknowledged to be a sale, than in *Ivanhoe Partners*. Secondly, the shareholders are transferring control in American Standard. The Delaware Supreme Court found it important that the standstill agreement between Gold Fields and Newmont limited Gold Fields' purchase to 49.9% of the outstanding common stock and to 40% representation on the board of Newmont. The Recapitalization Plan, however, provides for no mechanism to stop a change in control. Quite the contrary, here the sale of the public shareholders control in American Standard takes the form of options exercisable at the sole discretion of management. Thus, the transfer of control occurs now, while the relegation to minority status occurs sometime in the future under the exclusive control of management. Thirdly, unlike the acquisitions by Gold Fields from private sellers, the Board is "selling" American Standard. The Recapitalization Plan calls for management and directors alone to receive 11.7 shares of common stock in exchange for every one share presently owned. In addition, the ESOP will purchase stock from the company for its needs. Thus, whilethe public shareholders are receiving money in exchange for a percentage of their ownership interest in American Standard, the company is selling stock and options to management (in exchange for the value of the presently held common stock) and stock to the ESOP and Savings Plan (in exchange for 80 million dollars). Whereas all Newmont shareholders were treated equally with the distribution of the dividend, and whereas Gold Fields purchased its stock on the open market, American Standard's Recapitalization Plan provides for the transfer of stock and options to management and the ESOP without providing for the same opportunity to the public shareholder. Thus, the facts before this Court are sufficiently distinguishable from those in *Ivanhoe Partners* for this Court to conclude that on an expanded record the Recapitalization Plan would be found to amount to a sale of American Standard.

The Court, therefore, is presented with a situation in which management has said it wants to remain independent, yet its actions reveal that the company is for sale. The Court is struck by the different meanings that "independence" has. In *Ivanhoe Partners*, "independence" meant that the public shareholders retained a majority of the outstanding stock and majority representation in the board; that Gold Fields was absolutely limited in the amount of stock it could own and its representation on the board; and the directors of Newmont did not take advantage of the takeover threat as an opportunity to increase their, or employee, ownership interest in the company. "Independence" for the Newmont board meant finding a solution which had

the least effect on the status quo. On the facts of this case, however, "independence" has a different meaning. Here, the shareholders are acceding control in the corporation through the medium of stock options. The shareholders are not protected from the discretionary exercise of these options and the possible effect on the corporation. And management is availing themselves of the takeover threat to increase their, and the employee's, ownership interest in the company. Thus, while American Standard's board mimics Newmont's board's statement that they decided to keep the company independent, their understanding does not mean maintaining the status quo; rather, independence is achieved only through a change in control in American Standard.[9]

Furthermore, American Standard's conduct reveals the probability that it is in a bidding contest for the company. In response to Black & Decker's $65.00 per share offer, "American Standard, Inc. countered ... with a cash-and-debt recapitalization plan analysts and traders valued at between $68.00 and $70.00 a share, or $2.13 billion to $2.19 billion." Wall Street Journal, Feb. 19, 1988. In response to American Standard's announced plan, Black & Decker announced a sweetened bid for $68.00 a share. Wall Street Journal, Feb. 24, 1988. The latest escalation in this bidding war occurred on Friday, March 4, 1988, when American Standard announced that morning an increase in the cash portion of the Recapitalization Plan to $64.00 a share. Wall Street Journal, Mar. 7, 1988. In response, Black & Decker announced that afternoon that it would increase its offer to $73.00 a share. *Id.* Although American Standard's attorneys may contend in the courthouse that there is no bidding contest, the objective reports of the

conduct of the two parties reveal something quite different. The public must perceive, and the Court concludes, that Black & Decker has established the probability that this is a bidding contest and American Standard is for sale.

Having determined that the approval of the Recapitalization Plan "was a recognition that the company was for sale", *Revlon, Inc.*, 506 A.2d at 182, this Court must now determine whether the adoption of the severance plan and the amendments to the retirement and savings plans were actions consonant with the Board's duty of an auctioneer. The Delaware Supreme Court has made clear that once the Board is faced with the inevitable break up of the company, the use of defensive measures is no longer an option. *Id.* at 182. Rather, the Board's role "changes from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *Id.* Consequently, any action taken by the Board must be directed at obtaining the highest price for the benefit of the stockholders. *Id.*

The validity of the Board's conduct must be evaluated in light of its duty as an auctioneer. *See id.* at 183 (lock-up option is not *per se* illegal but is impermissible if it puts an end to the bidding process). Furthermore, any action taken must be evaluated in terms of the timing of the auction process. A lock-up option, for example, which draws a bidder into the bidding process, may not be invalid under *Revlon, Inc. Id.* That same lock-up option, entered into in the middle of an active auction, however, would be impermissible if it forecloses further bidding to the shareholders' detriment. *Id.* Thus, the Delaware Supreme Court

---

**9.** American Standard's own recent conduct belatedly implies that it understands it has reached the auction stage and the company is up for sale. On March 8, 1988, the Wall Street Journal reported that "sources close to American Standard have suggested that the company could auction itself, writing Black & Decker and others to review its books." Wall Street Journal, Mar. 8, 1985 at 26. The very next day it was reported that American Standard planned to "provide confidential information to hostile

suitor Black & Decker Corp. and to hold talks with the Towson, Maryland based concern and 'other potential purchasers of the company.'" Wall Street Journal, Mar. 9, 1988, at 3. Strangely, the belated public concession comes 33 days after one of the company's own directors, as early as February 4, privately understood that American Standard was taking actions in order to create a level playing field so that alternative bids, including the company's, could be developed. Donley Dep. D.I. 47B at 921.

concluded that one of the reasons for holding Revlon's lock-up with Forstmann invalid was because Forstmann had already been induced to enter the bidding contest. *Id.* The lock-up option, therefore, resulted in destroying the bidding process, not fostering it. *Id.*

Any action taken which favors one bidder over another is also examined by comparing the outstanding bids. In *Revlon, Inc.,* one of the reasons given for adopting the lock-up was that Forstmann had better financing. *Id.* at 183. The court, however, disagreed with the board's view of the financing and stated that "any distinctions between the rival bidders' methods of financing the proposal were nominal at best, and such a consideration has little or no significance in a cash offer for any and all shares." *Id.* at 184. The court also considered the value of the two competing offers and pointed out that the lock-up was given in return for a minimal improvement in the bids. *Id.* As a result, the court concluded the board had granted the lock-up on an insubstantial basis. *Id.*

Finally, the Delaware Supreme Court considered who derived the benefit from the board's action.[10] In *Revlon, Inc.,* it was apparent to the court that the shareholders and the directors of Revlon were going to derive the greatest benefit from the lock-up and subsequent sale to Forstmann. *Id.* at 182, 184. When a board of directors takes some action either to stimulate or initiate the bidding process, the board's main concern must be to benefit the shareholders.

A board may have regard for various constituencies in discharging its responsibilities, provided there are rationally related benefits accruing to the stockholders. However, such concern for nonstockholder interests is inappropriate when an auction among active bidders is

in progress, and the object no longer is to protect or maintain the corporate enterprise but to sell it to the highest bidder. *Revlon, Inc.,* 506 A.2d at 183 (citations omitted). The court rejected the board's action that favored corporate noteholders pointing out that the directors sought merely to protect themselves from possible lawsuits. *Id.* at 184. When this impermissible purpose was coupled with the insubstantial increase in the offer, the directors' action could not "withstand the enhanced scrutiny which *Unocal* requires of director conduct." *Id.,* citing *Unocal Corp. v. Mesa Petroleum Company,* Del.Supr., 493 A.2d 946, 954–55 (1985). The court concluded its discussion of a director's duty of an auctioneer and the action that can be taken in compliance with this duty by explaining that,

[W]hen bidders make relatively similar offers, or dissolution of the company becomes inevitable, the directors cannot fulfill their enhanced *Unocal* duties by playing favorites with the contending factions. Market forces must be allowed to operate freely to bring the target's shareholders the best price available for their equity. Thus, as the trial court ruled, the shareholders' interests necessitated that the board remain free to negotiate in the fulfillment of that duty.

*Revlon, Inc.,* 506 A.2d at 184.

■ With these principles established, this Court must now consider the actions taken by the Board in amending the Executive Supplement Retirement Benefit Program, the Excess Retirement Plan, the Retirement Plans, the Savings and Stock Ownership Plans (the "Retirement Plans") and the creation of the severance plan triggered by a change in control. This plan was designed to cover salaried employees assigned to corporate staff functions who were not currently a party to a "change in

10. One treatise points out that,

> [T]he key ingredient should be an examination of the effect of the lock-up on the primary (or intended) beneficiaries of the agreement.... Where, however, the directors allow considerations other than price to affect their analysis in a context where sale of the company appears inevitable, the courts will

scrutinize closely the actions of directors, especially where the lock-up has essentially terminated an active competitive bidding contest.

Balotti and Finkelstein, 5 *The Delaware Law of Corporations and Business Organizations,* Ch. 6.34 (1986 Supplement).

control agreement" with American Standard (the "Severance Plan" sometimes referred to collectively as the "Plans"). All of the Retirement Plans were amended to provide that "(i) all accrued benefits will vest, subject to collective bargaining requirements, upon a change in control and (ii) if they are terminated in whole or in part after a change in control, any surplus will be dedicated to provide retiree group life insurance and medical programs ... with no reversion of any portion of the surplus to American Standard." D.I. 47C at 1375–76. The savings and stock ownership Plans were amended, furthermore, so that all matching accounts would vest upon a change in control. *Id.* at 1376. In addition, a severance plan was adopted to provide for payments to salaried employees assigned to corporate staff functions in the event of a change in control. *Id.* The Board also amended the definition of a "change in control" to provide for the exemption of the Recapitalization Plan. *Id.* at 1383. Consequently, if there were a change in control pursuant to the Recapitalization Plan, the actions taken on February 18 would not take effect.

The effect of the Plan is to treat the competing bidders unfairly.[11] In the event of a change in control, such as a successful Black & Decker takeover, the Retirement Plans call for an acceleration of payments. This would result in an immediate loss of 80 million dollars to American Standard shareholders. Marquard Affidavit, D.I. 44 at 6. Furthermore, in the event of that same change in control, it has been estimated that the cost of the Severance Plan to a successful bidder would be 50 million dollars. *Id.* The Board, on the other hand, as discussed *supra,* has exempted the Recapitalization Plan from the definition of a change in control. So a successful vote on the Recapitalization Plan provides management and employees a 130 million dollar

advantage. Thus, it is clear that the Board's actions places Black & Decker on an unequal footing in its bid for control.

Moreover, it does not appear that there is any justification for such continuing unequal treatment. Indeed the value of the competing offers are substantially similar. At the time the Retirement Plans were amended and the Severance Plan was created, the Recapitalization Plan's estimated value was between $70.00—$72.00 a share and Black & Decker's offer was at $65.00 a share. Black & Decker then increased its offer to $68.00 a share. At the present, the Recapitalization Plan's value is now estimated at $74.00—$75.00 and Black & Decker's offer is at $73.00. Although it initially appears that the competing bids were far apart, the Recapitalization Plan, at the time it was approved, may not have been a viable offer. The Recapitalization Plan contemplated a $59.00 dividend which would have required $1,761,000.00 in cash in order to provide the necessary surplus. *See* D.I. 66 at 2083; Crawford Affidavit, D.I. 64. Consequently, one need not conclude that the favored Recapitalization Plan was a clearly superior offer. Furthermore, since Black & Decker's offer is an offer for any and all shares, any alleged differences in the methods of financing in an attempt to justify the unequal treatment has "little or no significance." *Revlon, Inc.,* 506 A.2d at 184.

Finally, it is difficult to see how the amendment to the Retirement Plans and the enactment of the Severance Plan benefit the shareholders. *Revlon, Inc.* makes clear that "concern for non-stockholder interests is inappropriate when an auction among active bidders is in progress, and the object is no longer to protect or maintain the corporate enterprise but to sell it to the highest bidder." *Revlon, Inc.,* 506 A.2d at 182. Thus, it is probable that the

11. During a telephone conference call with all of the parties on March 14, 1988, counsel for American Standard stated that there was a possible higher bid from an undisclosed third party. At this time, however, this unknown potential bidder remains a mere possibility. In fact, the Court is presented with only two actual bidders. Thus, American Standard's argument that the effect of the Plans may be the subject of negotiations is not relevant since the Recapitalization Plan is exempt from the effect of these Plans. The possibility of negotiations, therefore, is illusory since it is only Black & Decker who must give up something in order to be placed in the same position as management and the employees.

Board abrogated its duty when it adopted the amendments to the Retirement Plans and enacted the Severance Plan in order to provide for its employees when its concern should have been to sell the company to the highest bidder. No doubt one could conclude in a different situation with different timing that severance and retirement plans are legitimate corporate functions designed to reward corporate officers fidelity and performance. Indeed, in other situations, courts have found the plans due to the deference accorded the business judgment rule. *Cf. Buckhorn, Inc.*, 656 F.Supp. at 232. But these Plans were designed to deter bidding and, in the *Revlon* context, provide a substantial basis for concluding that Black & Decker will succeed on the merits.

In conclusion, Black & Decker has carried its burden of showing a probability of success on the question of whether the Board breached its duty under *Revlon, Inc.* by amending the Retirement Plans and enacting the Severance Plan. At this time, it appears that the Plans do not foster the bidding process. Rather, Black & Decker has preliminarily shown that they, in fact, unfairly favor the Recapitalization Plan.

*Injunctive Relief*

It is well recognized that the granting of a preliminary injunction is an extraordinary remedy. The standards for granting a preliminary injunction are well established and require little elaboration. A preliminary injunction is not granted as a matter of right. *Norfolk Southern Corp. v. Oberly*, 594 F.Supp. 514, 519 (D.Del.1984), citing *Eli Lilly and Co. v. Premo Pharmaceutical Labs.*, 630 F.2d 120, 136 (3d Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). Because it is an extraordinary remedy, it is sparingly granted. *Norfolk Southern Corp.*, 594 F.2d at 514, citing *Dorfmann v. Boozer*, 414 F.2d 1168 (D.C.Cir.1969); *Wyrough & Loser, Inc. v. Pelmor Laboratories, Inc.*, 376 F.2d 543, 547 (3d Cir.1967). In order to obtain a preliminary injunction, the moving party must show "(1) a reasonable probability of eventual success in the litigation, and (2) that irreparable injury will ensue if relief is not granted. In addition, the court may consider (3) the possibility of harm to other interested persons from the grant or denial of relief, and (4) the public interest." *Kennecott Corp. v. Smith*, 637 F.2d 181, 187 (3d Cir.1980), citing *Constructors Ass'n of Western Pennsylvania v. Kreps*, 573 F.2d 811, 815 (3d Cir.1978); *Delaware River Port Auth. v. Transamerican Trail. Tr., Inc.*, 501 F.2d 917, 919–20 (3d Cir.1974).

■ Plaintiff has carried its burden of showing that both the amendments to the Retirement Plans and the establishment of a Severance Plan will likely place Black & Decker on an unequal footing with American Standard in its bid for control of the company. Having concluded that Plaintiff has shown a reasonable probability of success on the merits, the Court must now consider the question of irreparable harm. Given the unequal bidding conditions, the Court finds that were the Plans not enjoined, Black & Decker would be unable to fairly compete with American Standard. As the court found in *Revlon, Inc.*, the duties of the board are changed when the break-up or sale of the company is inevitable. *Revlon, Inc.*, 506 A.2d at 182. American Standard's Board must not give preferential treatment to one bidder over another. Where, as here, the "other bidder" is the management and employees, the Court is even more mindful of the Board's duties to ensure that the bidding process is fair.

The Court is also sensitive to the difficulties, if not inequities, of allowing the Plans to remain in place and leaving this issue for resolution at some later date. Given the financial intricacies involved in Black & Decker's proposed bid for control of American Standard, unraveling the facts would be a formidable task if Black & Decker's bid were to fail. Under such circumstances, it would be difficult for this Court to fashion an appropriate remedy which would provide for money damages. Furthermore, if Black & Decker were successful in its tender offer and the preliminary injunction were not granted, Black & Decker would be faced with immediate liabilities which could not be adequately redressed at

a later date. As shown above, a change in control would effectively deprive Black & Decker of 130 million dollars. This money is dispersed through pension and severance plans. Therefore, if Black & Decker were successful after prolonged litigation, this money would be virtually irretrievable because it is no longer under the control of the corporation. In addition, any attempt to calculate damages would pose insurmountable problems. Therefore, as in *Revlon, Inc.*, the Court finds that "the obstacles to [Black & Decker's] obtaining a meaningful legal remedy are immense." *Id.* at 185. In conclusion, Black & Decker has satisfied its burden of showing irreparable harm.

Furthermore, the Court also finds that the Plaintiff has carried its burden of showing that the balance of hardships tips in favor of Black & Decker. As discussed *supra*, the Court cannot conclude at this time that the effect of the Plans would inure to the benefit of the shareholders of American Standard. Indeed, the presence of the Plans may, in fact, deter prospective bidders from competing with the Recapitalization Plan, thus denying shareholders the maximum price for their stock. Finally, as for the public interest factor, the Delaware Supreme Court has made a policy determination that when the directors are faced with the inevitable break-up or sale of the company, they must act as auctioneers. This Court, therefore, when confronted with these facts must follow the policy of the law of this State.

For the foregoing reasons, Plaintiff's motion for a preliminary injunction enjoining the Plans will be granted.

The parties shall submit an order in conformity with this Opinion enjoining preliminarily American Standard Inc., its officers, directors, agents, servants and employees and those persons in active concert or participation with them who receive actual notice thereof, from taking any action in connection with the amendment to the Retirement Plans and the Severance Plan, as more fully delineated in this Opinion. In addition, Black & Decker shall provide forthwith sufficient security in an amount stipulated to by the parties or, alternatively, ordered by the Court.